23545

The STATE, Respondent v. James William WILSON, Appellant.

(413 S.E. (2d) 19)

Supreme Court

*David I. Bruck,* of *S.C. Office of Appellate Defense,* Columbia, and *David G. Belser,* Asheville, N.C., *for appellant.*

*Atty. Gen. T. Travis Medlock, Chief Deputy Atty. Gen. Donald J. Zelenka,* Columbia, and *Sol. W. Townes Jones, IV,* Greenwood, *for respondent.*

Heard Sept. 26, 1990; Decided Jan. 6, 1992.

Reh. Den. Feb. 4, 1992.

TOAL, Justice:

The primary issue which we address in this appeal is whether a sentence of death for a defendant who pleads or is found "guilty but mentally ill," as that verdict is defined by South Carolina statute, violates the Cruel and Unusual Punishment Clause of the Eighth Amendment of the United States Constitution. Stated in a different fashion, the question we answer here is whether a person, acting under what amounts to an "irresistible impulse" to commit an offense, may constitutionally be sentenced to death for the commission of that offense. We hold that the Eighth Amendment does not bar such a sentence, and we therefore affirm.

## FACTS

On the morning of September 26, 1988, Jamie Wilson drove to his maternal grandmother's house and stole her .22 caliber, nine-shot revolver. Wilson then drove to an Abbeville discount store and purchased some .22 hollow-point long rifle ammunition. Wilson discarded the bullets already loaded in the gun, and reloaded the weapon with the more destructive hollow-point bullets. Wilson next proceeded to the Oakland Elementary School in Greenwood, where he parked his 1974 Maverick. He entered the school, finding his way to the cafeteria, where he stood quietly for a moment. It was right at lunch time for many of the children. Next, Wilson pulled out the pistol and began shooting, picking his victims, both children and adults, at random. Witnesses observed a look of hatred and rage masking Wilson's face.

Wilson fired until his gun was empty. He then went into a restroom and reloaded the weapon, after which he entered a classroom and opened fire again. After emptying his gun a second time, Wilson threw the gun down and stepped outside through a window. A teacher spotted him and told him to remain still with his hands up, which Wilson did. The police then arrived and took Wilson into custody.

The terror created and damage inflicted by Wilson on September 26 was considerable, and an entire nation was shocked, as the unthinkable had occurred. One female first

grade teacher was shot once in the shoulder and once in the left hand, with the bullet traveling through her hand and into her throat. A young boy slumped forward onto a cafeteria table after Wilson aimed his pistol at the boy's temple and fired, hitting the boy in the head. Two little girls, both age eight, were shot dead. Children screamed; children fled; children hid under their desks; other children were shot.

Altogether, Wilson was indicted for two counts of murder, nine counts of assault and battery with intent to kill, and one count of illegally carrying a firearm. Wilson pled "guilty but mental ill" (GBMI) to substantially all of the charges, and his plea was accepted. He was sentenced to twenty years, each sentence to be served consecutively, for each of eight counts of assault and battery with intent to kill; ten years, consecutive, for assault and battery of a high and aggravated nature; and five years, consecutive, for illegally carrying a firearm. Wilson elected to have the penalty phase of his capital murder charges tried by the trial judge without a jury. The trial judge affirmatively found the existence of two statutory aggravating circumstances: (1) murder wherein two or more persons are murdered pursuant to one act or scheme; and (2) murder of a child eleven years of age or under. The trial judge also found the existence of four statutory mitigating circumstances: (1) defendant has no significant history of prior violent crime conviction; (2) the murder was committed under the influence of mental or emotional disturbance; (3) capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and (4) the age or mentality of the defendant at the time of the crime. Wilson was then sentenced to death for each of the two murders. Wilson now appeals his death sentence.

## LAW/ANALYSIS

Wilson makes several arguments for reversal of his sentence: (1) the state legislature did not intend, and therefore does not permit, execution as punishment for a defendant found "guilty but mentally ill" pursuant to S.C. Code Ann. § 17-24-20(A) (1989 Cum. Supp.); (2) the execution of a GBMI defendant, as that verdict is defined by South Carolina statute, violates the Cruel and Unusual Punishment prohibi-

tion of the Eighth Amendment; (3) Wilson's sentence is excessive and disproportionate under S.C. Code Ann. § 16-3-25(C)(3) (1989 Cum. Supp.); and (4) the lower court judge failed to take into account all mitigating circumstances in reaching his decision on sentencing. We shall address these contentions in order.

## I. STATUTORY CONSTRUCTION

Wilson contends that, in creating the verdict entitled "guilty but mentally ill," the South Carolina legislature did not intent that death be a potential punishment. Wilson makes reference primarily to the language of S.C. Code Ann. § 17-24-70 (1989 Cum. Supp.) to support his argument. This statutory section deals with sentencing of a GBMI defendant. It provides:

> If a verdict is returned of "guilty but mentally ill" the defendant must be sentenced by the trial judge as provided by law for a defendant found guilty, however:

> (A) If the sentence imposed upon the defendant includes the incarceration of the defendant, the defendant must first be taken to a facility designated by the Department of Corrections for treatment and retained there until in the opinion of the staff at that facility the defendant may safely be moved to the general population of the Department of Corrections to serve the remainder of his sentence.

> (B) If the sentence includes a probationary sentence, the judge may impose those conditions and restrictions on the release of the defendant as the judge considers necessary for the safety of the defendant and of the community.

It is Wilson's position that since there is no provision which gives specific guidance to a lower court which sentences a GBMI defendant to death, such a sentence was not contemplated by the legislature. We reject this contention. Wilson refuses to read with any force that portion of the statute which is phrased in mandatory and crystal-clear terms, *viz.*, "[i]f a verdict is returned of 'guilty but mentally ill' the defendant *must* be sentenced . . . as provided by law for a

defendant found *guilty* . . ." (emphasis added). The punishment for one found *guilty* of murder is set forth in S.C. Code Ann. § 16-3-20 (1976) as follows: "[a] person who is convicted of or pleads guilty to murder must be punished by *death* or by imprisonment for life. . . ." (emphasis added). Hence, we hold that the plain language of the GBMI statute clearly allows for a death sentence in an appropriate case. The fact that the legislature does not provide for special guidance or a specific procedure to be used in cases where a GBMI defendant is sentenced to death does not mean from a logical standpoint that no death sentence may be handed down, as Wilson urges. Instead, it simply means, we hold, that the legislature did not see fit to provide lower courts with any special guidance or procedure in such an instance. We decline to ignore the clear language of the statute in favor of Wilson's strained reading.

Beyond the plain language of § 17-24-70, however, there exist other reasons why we are convinced that the legislature intended that a sentence of death be possible for certain GBMI defendants. First, we are persuaded that § 17-24-20(C) (1989 Cum. Supp.),[1] which provides "[t]he verdict of 'guilty but mentally ill' may be rendered only during the phase of a trial which determines guilt or innocence and *is not a form of verdict which may be rendered in the penalty phase,*" (emphasis added) is indicative of a legislative intent that a bifurcated capital case may be necessary for some GBMI defendants. We interpret this language to prohibit juries or judges from treating the defendant as anything other than an ordinary "guilty" defendant for purposes of rendering their sentencing verdict.

Secondly, it is well established that the purposes for the enactment of GBMI statutes nationwide are: (1) to reduce the number of persons being completely relieved of criminal responsibility due to their mental condition; and (2) to insure that mentally ill defendants receive treatment while incarcer-

---

[1] South Carolina Code Ann. § 17-24-20 was amended after the date of Wilson's crime and sentencing to clarify the allocation of the burden of proof. Act No. 93, 1989 S.C. Acts 226 (eff. Aug. 17, 1989). As a result of this amendment, the subsection providing for an evidentiary hearing prior to acceptance of a plea of GBMI was renumbered from § 17-24-20(C) to § 17-24-20(D). Also, subsection (C) was numbered in the statute as (B) at the time of Wilson's sentencing. The 1989 amendments have no substantive effect on the issues involved in this case.

ated for their benefit as well as society's. *See generally,* Annotation, *"Guilty But Mentally Ill" Statutes: Validity and Construction,* 71 A.L.R. 4th 702, 777-780 (1989); *People v. Smith,* 124 Ill. App. (3d) 805, 80 Ill. Dec. 310, 465 N.E. (2d) 101 (1984); *People v. Ramsey,* 422 Mich. 500, 375 N.W. (2d) 297 (1985); *Commonwealth v. Trill,* 374 Pa. Super. 549, 543 A. (2d) 1106 (1988). Hence, as a general proposition, GBMI statutes were created in part to narrow the field of defendants who could successfully claim a lack of culpability via the insanity defense. Wilson seeks here to use the verdict as a shield to protect him from punishment, which is contrary in a fundamental way to its creation as a mechanism to enable the state to punish and treat a larger group of defendants.

Lastly, very similar arguments concerning legislative intent have been rejected by courts in other jurisdictions, and we find those holdings persuasive. *See, e.g., People v. Crews,* 122 Ill. (2d) 266, 19 Ill. Dec. 308, 522 N.E. (2d) 1167 (1988), *cert. denied,* 492 U.S. 925, 109 S. Ct. 3260, 106 L. Ed. (2d) 605 (1989). Accordingly, for all of the above reasons, we hold that the legislature intended that GBMI defendants be sentenced to death in appropriate cases.

## II. CRUEL AND UNUSUAL PUNISHMENT

Wilson next argues that, even if the legislature intended that death be an optional sentence for certain GBMI defendants, he may not be so sentenced because of the constitutional proscription against Cruel and Unusual punishment.[2]

In South Carolina, the GBMI verdict is defined as follows:

> A defendant is "guilty but mentally ill" if, at the time of the commission of the act constituting the offense, he had the capacity to distinguish right from wrong or to recognize his act as being wrong as defined in Section 17-24-10(A),[3] but because of mental disease or defect he lacked

---

[2] U.S. Const. Amend. VIII.

[3] South Carolina Code Ann. § 17-24-10(A) (1989 Cum. Supp.) is South Carolina's insanity defense. It provides:

(A) It is an affirmative defense to a prosecution for a crime that, at the time of the commission of the act constituting the offense, the defendant, as a result of mental disease or defect, lacked the capacity to distinguish moral or legal right from moral or legal wrong or to recognize the particular act charged as morally or legally wrong.

sufficient capacity to conform his conduct to the requirements of the law.

S.C. Code Ann. § 17-24-20(A) (1989 Cum. Supp.). Wilson points out, his guilty plea having been accepted pursuant to the statute, that it is an established, unreviewable fact that he was unable to control his behavior on September 26, 1988. Stated differently, one could say that Wilson was in fact acting under an "irresistible impulse" to commit the enumerated acts of violence on that fall day. By definition then, contends Wilson, a GBMI defendant is less culpable than a defendant who could control his actions. Further, Wilson contends, a GBMI defendant is, by definition, so lacking in culpability as to be unexecutable. While we agree that a GBMI defendant, under South Carolina law, has in essence been found to have acted under an irresistible impulse at the time of his crime, our agreement with Wilson ends at that point. Wilson's arguments concerning culpability simply miss the mark.

In order to explain our ruling, a digression into the law of insanity is necessary. South Carolina has chosen as its insanity defense what is commonly known as the *M'Naghten* test, or the "right and wrong" test. (The test is set forward in footnote three, *supra*). It was spawned in England, in *M'Naghten's Case*, 8 Eng. Rep. 718 (1843). M'Naghten shot the Prime Minister's private secretary, mistaking the secretary for the Prime Minister, and was acquitted based on an insanity defense. The outcry at the acquittal eventually led to the formulation of the aforementioned test for insanity. It is conceded that Wilson was not "insane," as that term is defined by our *M'Naghten* test. South Carolina has rejected the so-called "irresistible impulse" test as an insanity defense.

In several states, Wilson observes, he would be found innocent of all criminal behavior since those states incorporate the irresistible impulse test into their insanity defense. This test essentially engages the court to determine whether the defendant was acting, at the time of his alleged criminal behavior, pursuant to an irresistible impulse, or was unable to control himself. If so, the defendant is adjudged insane and held not responsible for his acts. It matters not that the defendant knew that the act he was committing was wrong. We eschew this analysis.

In South Carolina, the key to insanity is "the power [of the defendant] to distinguish right from wrong in the act itself—to recognize the act complained of is either morally or legally wrong. When this power exists in a defendant . . . he must answer for his acts." *State v. Grimes*, 292 S.C. 204, 205 n. 1, 355 S.E. (2d) 538, 539 n. 1 (1987) (quoting *State v. McIntosh*, 39 S.C. 97, 17 S.E. 446 (1893)) (emphasis omitted). We have sound reasons for adopting this test for culpability vis-a-vis insanity.

First, the irresistible impulse test is very difficult, if not impossible, to apply with accuracy. It has been suggested that it is impossible to say that an impulse was irresistible rather than unsuccessfully resisted, or to distinguish between the uncontrollable impulse and the impulse that is not controlled. *State v. White*, 60 Wash. (2d) 551, 374 P. (2d) 942 (1962) (citing *Commonwealth v. Woodhouse*, 401 Pa. 242, 164 A. (2d) 98 (1960)).

Secondly, the irresistible impulse test is plagued by internal debate over its validity within the profession of psychiatry. The federal insanity defense was recently amended to delete the irresistible impulse or "volitional prong." "A primary reason that the definition of insanity was altered by the (federal) Insanity Reform Act (to delete the irresistible impulse test) is that psychiatrists themselves are unable to agree upon the meaning of an 'irresistible impulse.' " *United States v. Freeman*, 804 F. (2d) 1574, 1576 (11th Cir. 1986) (citing S. Rep. 225, 98th Cong. (2d) Sess. 226-29, *reprinted* in 1984 U.S. Code Cong. & Ad. News 3182, 3408-11).

Willard Gaylin, a respected psychoanalyst, has observed:

> We must maintain our distinctions between the purposes of psychiatry and the purposes of the law. Psychiatry serves the individual, and is directed at restoring him to health. The law serves the community, and is designed to secure its values and preserve its safety. The law demands an essential responsibility of its citizens. It assumes with Aristotle that "what lies in our powers to do, lies in our powers not to do."

Gaylin, *Legal Insanity: Gone Bonkers*, Washington Post, June 20, 1982 at Cl, C5. (quoted in diGenova and Toensing, *The Federal Insanity Defense: A Time For Change in the Post-*

*Hinckley Era,* 24 S. Tex. L.J. 721, 727-78 (1983). The Supreme Court of Pennsylvania, in a very persuasive opinion, severely criticized the irresistible impulse test:

> The law, in its effort to shape a rational social policy, grounded in the broadly shared assumptions of the individuals who make up society, cannot admit that acts an individual carefully plans and carries out to advance his own desire, when he knows those acts will result in the death of a human being, will not be punished simply because of the intensity or strangeness of that desire. Such an admission proceeds imperceptibly to the absurd result that the more strange and brutal the act the more likely the actor is to be relieved of its criminal consequences. Along the psychoanalytic continuum [sic] the outrageous proves the innocence. In an oddly circular fashion the act establishes its cause as mental illness and the mental illness determines the act. Such analysis may be medically useful. It is not legally useful.

*Commonwealth v. Weinstein,* 499 Pa. 106, 116, 451 A. (2d) 1344, 1349 (1982).

The difficulty lies in the fact that reasonable people normally do not commit crimes, much less heinous crimes of the kind committed here. Hence, criminals like Jamie Wilson are, of necessity, unreasonable in their actions. They, of necessity, have an abnormal desire or compulsion to take these criminal actions. This does not mean that they should not be punished. There is rarely a need to punish those who are reasonable and rational. Our penal system was developed to punish those who refuse to act reasonably, and to deter those who can be deterred from acting unreasonably. The very underpinnings of our criminal law would give way if the thinking behind the irresistible impulse test is carried to its logical extreme.

Therefore, South Carolina has rejected the irresistible impulse test for insanity. As a constitutional matter, this is clearly permissible. In *Leland v. Oregon,* 343 U.S. 790, 72 S. Ct. 1002, 96 L. Ed. 1302 (1952),[4] the United States Supreme

---

[4] More recently, the Supreme Court has declined to reconsider its *Leland* decision. *See Rivera v. Delaware,* 429 U.S. 877, 97 S. Ct. 226, 50 L. Ed. (2d) 160 (1976) (defendant's request to overrule *Leland* dismissed for want of substantial federal question).

Court ruled that a defendant is not entitled, as a matter of fundamental due process, to an irresistible impulse insanity defense, and that states are free to adopt the *M'Naghten* test for insanity.[5] South Carolina does not recognize that one acting under an irresistible impulse is somehow less culpable.[6] Instead, the statutory scheme specifically provides that one acting under such an impulse is *guilty*, albeit "guilty but mentally ill." We are aware of no authority which requires this Court to recognize that the irresistible impulse test, when satisfied, conclusively demonstrates a lack of *culpability*. In fact, all authority of which we are aware indicates to the contrary—that this state is free to define culpability, as it relates to insanity, under the *M'Naghten* standard rather than the irresistible impulse standard. With this in mind, we turn now to Wilson's precise arguments.

Wilson contends his sentence violates the principle of the Eighth Amendment Cruel and Unusual Punishment Clause which requires that "for purposes of imposing the death penalty . . . punishment must be tailored to [a defendant's] personal responsibility and moral guilt." *Enmund v. Florida*, 458 U.S. 782, 801, 102 S. Ct. 3368, 3378, 73 L. Ed. (2d) 1140 (1982). He asserts that since he was acting under an irresistible impulse and therefore could not control himself, he is not personally culpable enough to receive a death sentence. This contention amounts to a request by Wilson that we give constitutional stature to the irresistible impulse test in the death penalty context. We decline to do so, and we reject the premise in Wilson's argument. As stated earlier, under South Carolina law, Wilson is just as culpable as any other guilty defendant. Hence, there is no diminishment in his "personal responsibility and moral guilt."[7] For similar reasons, we decline to accept Wilson's argument that no penological justification for his sentence exists. We hold that the penological goal of

---

[5] Some jurisdictions have completely abolished the insanity defense, and take the position that such action is constitutionally permitted. *See State v. Korell*, 213 Mont. 316, 690 P. (2d) 992 (1984); *State v. Searcy*, 118 Idaho 632, 798 P. (2d) 914 (1990).

[6] We do recognize the potential diminishment in culpability resulting from the existence of the mitigating factors in this case. However, the fact that Wilson acted pursuant to an irresistible impulse does not act as a bar to the imposition of the death penalty or necessitate that a jury find him less culpable and punish him less severely.

[7] *But see* footnote six, *supra*.

retribution is served by this sentence, as, under South Carolina law, Wilson is completely culpable and responsible for his crimes.

The Eighth Amendment prohibits punishment considered "Cruel and Unusual" at the time the Bill of Rights was adopted. *Solem v. Helm,* 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. (2d) 637 (1983). In *Penry v. Lynaugh,* 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. (2d) 256 (1989) the United States Supreme Court was asked whether mentally retarded individuals may be executed, and observed that the ancient common law forbade the execution of those who were "idiots" and/or "lunatics," defined as those under a "natural disability" at the time of the crime to distinguish "between good and evil." 109 S. Ct. at 2953. The Court stated, "[t]he common law prohibition against punishing 'idiots' for their crimes and unusual' punishment to execute persons who are profoundly retarded and wholly lacking the capacity to appreciate the wrongfulness of their actions." 109 S. Ct. at 2954.

As can be seen in the mental retardation context, the ancient common law was concerned, not with "impulsive behavior" but with an individual's ability to know right from wrong. Similarly, there is no authority which persuades us that a defendant who is adjudged sane under the *M'Naghten* test but who was acting under an irresistible impulse would have been shielded from the death penalty in 1789.[8]

The Eighth Amendment analysis does not stop with an examination of the intent of the framers of the Constitution. "The prohibition against cruel and unusual punishments also recognizes the 'evolving standards of decency that mark the progress of a maturing society.' " *Penry,* 109 S. Ct. at 2953 (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S. Ct. 590, 598, 2 L. Ed. (2d) 630 (1958)). In implementing this test, the Court has "looked to objective evidence of how our society

---

[8] We note that the case before us here does not involve whether Wilson, at the time of his scheduled execution, may in fact be executed. The issue of executing the insane is addressed by the United States Supreme Court in *Ford v. Wainwright,* 477 U.S. 399, 106 S. Ct. 2595, 91 L. Ed. (2d) 335 (1986), wherein the Court prohibits execution where a convict does not have the sanity to understand the fact that he is being executed and for what reason. The instant case, on the other hand, only involves whether Wilson may be sentenced to death, and focuses on his mental health at the time of the commission of the crime, not at the time of his future execution date.

views a particular punishment today." 109 S. Ct. at 2953. In this connection, Wilson points out that only three jurisdictions, South Carolina, Pennsylvania, and Delaware, have GBMI statutes and allow for a death sentence even though the defendant was acting under an irresistible impulse at the time he committed the crime. We note that the United States Supreme Court recently reiterated, "[i]t is not the burden of [a state], however, to establish a national consensus approving what their citizens have voted to do; rather, it is the 'heavy burden' of [the defendant] to establish a national consensus *against* it." (emphasis in the original). *Stanford v. Kentucky*, 492 U.S. 361, 109 S. Ct. 2969, 2977, 106 L. Ed. (2d) 306 (1989).

Thirty-seven states now have the death penalty. Of those, a substantial number have adopted, as a matter of constitutionally permitted choice, the *M'Naghten* test for insanity, and not the irresistible impulse test. Furthermore, many have no GBMI verdict option. In these states (which included South Carolina for many years), no legal impediment exists to the execution of a defendant who is not insane as defined by the *M'Naghten* test, but who may have committed the crime under an irresistible impulse. Wilson has compiled no information relating to these states. It seems to us that the more fortuity that only three states have expressly stated in affirmative fashion that a death sentence can occur in a case like Wilson's is not dispositive. In order to completely review this question, therefore, all states having the death penalty should have been reviewed, instead of only those states having a GBMI verdict.

We hold that Wilson has failed to carry his burden of proof in this regard. He asserts that seven states having a death penalty would not allow him to be sentenced to death, since he was unable to conform his conduct to the requirements of law. He admits that three states would. We are left to ponder what the remaining twenty-seven states would do.

It appears to us from our independent review that at least fourteen states indeed do have: (1) the strict *M'Naghten* defense or no insanity defense; (2) no GBMI verdict; and (3) the death penalty. *E.g.* Arizona, California, Colorado, Florida, Idaho, Kansas, Louisiana, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Jersey, Washington. *See generally* Annotation, *Modern State of Test of Criminal Responsibil-*

*ity—State Cases*, 9 A.L.R. 4th 526 (1981). States of this type would have no legal mechanism allowing a Wilson-type defendant relief from a death sentence, assuming state constitutional law does not come into play. After including South Carolina, Delaware and Pennsylvania, the number of states in which Wilson would be a candidate for the death penalty is seventeen. This is nearly thirty percent of all states. In the absence of a very extensive study of all death penalty jurisdictions, and taking into account the status of the above-listed seventeen states, we are unconvinced that Wilson has proven a national consensus exists against the imposition of the death penalty on defendants like him.

Wilson points out that another "significant objective index of contemporary values" regarding a given punishment is the sentencing behavior of trial juries. *Gregg v. Georgia*, 428 U.S. 153, 181, 96 S. Ct. 2909, 2929, 49 L. Ed. (2d) 859 (1976). Wilson states in his brief, "[a]ssessing the willingness of juries to impose death sentences on defendants found to lack the capacity to conform their conduct to the law is undeniably problematic, for the revealing reason that in only three states—South Carolina, Delaware and Pennsylvania—are such sentences even theoretically possible." (Appellant's Brief at p. 27). This statement is misleading in that it again contemplates only the ten death penalty states which have GBMI verdicts of some kind. We are unable to determine any nationwide consensus, as we are unable to conclusively discern whether it is "theoretically possible" to have such a sentence in the other twenty-seven death penalty states. As stated above, a death penalty state which has no GBMI verdict and has the *M'Naghten* insanity defense would as a legislative matter allow for a death sentence to be handed down against one who could not conform his conduct but who knew his acts were wrong. Wilson has thus proven nothing through his cursory review of the "sentencing behavior of trial juries" nor has he proven a national consensus against the death penalty for defendants of his type through any other objective evidence.

Wilson argues in his brief that his sentence violates both the South Carolina and United States Constitutions. Although his argument concerning the South Carolina Constitution is not properly before us because it is not embodied in any exception, we nevertheless address it and reject it as meritless.

South Carolina's proscription against certain punishments is found in Article I, § 15 of the State Constitution. This provision reads, in pertinent part:

Excessive bail shall not be required; nor shall excessive fines be imposed; nor shall cruel, nor corporal, nor unusual punishment be inflicted. . . .

This language clearly bans cruel *or* unusual punishments; unlike the textual ban in the United States Constitution, which literally reads that "cruel *and* unusual" punishments are forbidden. Despite this difference in verbiage, we note that the United States Supreme Court effectively treats the "and," as an "or" in their Eighth Amendment analysis. *Tison v. Arizona*, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. (2d) 127 (1987); *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. (2d) 1140 (1982). The Court still considers it their constitutional obligation to judge whether the "nexus between the punishment imposed and the defendant's blameworthiness is proportional."[9] This is the Court's formulation of a test of whether the punishment is cruel. To require this analysis in all death penalty cases is to read the "and" as "or."

Thus, the use of the disjunctive "or" rather than "and" in the South Carolina Constitution is of no importance in this case, since the analysis we employ is the same under both constitutions. Having determined that no violation of the Eighth Amendment occurred, we also hold there is no violation of the South Carolina Constitution. We hold, therefore, that Wilson has failed to show that his sentence amounts to "Cruel and Unusual" punishment.[10]

---

[9] In the recent case of *Stanford v. Kentucky*, 492 U.S. 361, 109 S. Ct. 2969, 106 L. Ed. (2d) 306 (1989), Justice Scalia (joined by Justices White, Kennedy, and Chief Justice Rehnquist) articulated the view that the Court should determine "cruelty" under the Eighth Amendment by looking to the framers' intent and by looking to the evidence of current views held by United States citizens on whether the punishment is "unusual." A majority of the justices, made up of the four dissenters in *Stanford* in combination with Justice O'Connor, who concurred in the result in *Stanford,* continue to mandate a further analytical step, *viz.,* proportionality analysis. Whether the South Carolina Constitution requires proportionality analysis is thus irrelevant, since a proper Eighth Amendment treatment requires it, and since a proportionality analysis is mandatory by statute in this state. *See* § 16-3-25(C)(3) (1989 Cum. Supp.) and Part III of this opinion, *infra.*

[10] We note that the result of Wilson's argument, if accepted by this Court, would be that since it is cruel and unusual to punish a defendant of Wilson's

## III. DISPROPORTIONATE AND
## EXCESSIVE SENTENCE

Wilson next argues that his sentence must be over-
turned pursuant to S.C. Code Ann. § 16-3-25(C)(3)
(1989 Cum. Supp.), which obligates this Court to deter-
mine, prior to affirming any sentence of death, whether the
sentence "is excessive or disproportionate to the penalty im-
posed in similar cases, considering both the crime and the de-
fendant." Wilson stresses the "and the defendant." language
in the statute, and asserts that since he was acting under an
irresistible impulse, he has less personal culpability and there-
fore fails to measure up to other defendants who have had
their death sentences affirmed. We disagree.

As mentioned above, South Carolina has declined to recog-
nize the irresistible impulse test as a defense or as a factor
dramatically reducing culpability. Of course, insofar as Wil-
son's mental incapacity is embodied in mitigating factors, his
culpability is potentially reduced. By statute, mental capacity,
mental disturbance, and the capacity to control one's conduct
are considered as mitigating factors in determining an appro-
priate sentence for a given defendant in a capital murder
case.[11] All of these mitigating factors were considered by the
trial judge in this case. (*See* Tr. 1195-96).

In this particular case, this mitigating evidence did not dis-
suade the lower court from sentencing Wilson to death. Simi-
larly, Wilson has failed to dissuade us from affirming his sen-
tence. We have previously affirmed sentences of death for de-
fendants when the identical three mitigating factors existed in
the defendant's favor. *See, e.g., State v. Middleton,* 295 S.C.
318, 368 S.E. (2d) 457 (1988), *cert. denied,* 488 U.S. 872, 109 S.
Ct. 189, 102 L. Ed. (2d) 158 (1988); *State v. Bell,* 302 S.C. 18,
393 S.E. (2d) 364 (1990), *cert. denied,* — U.S. —, 111 S. Ct. 227,
112 L. Ed. (2d) 182 (1990) *(See* Tr. 2147 in that case). Wilson's

status, present death row prisoners could potentially attack their sentences in
a new proceeding on the ground that they were acting under an irresistible
impulse at the time of their crimes.

[11] *See* S.C. Code Ann. § 16-3-20(C)(b)(2) (1985), which recites that a mitigat-
ing factor exists when "[t]he murder was committed while the defendant was
under the influence of mental or emotional disturbance." *See also* § 16-3-
20(C)(b)(6), "[t]he capacity of the defendant to appreciate the criminality of
his conduct or to conform his conduct to the requirements of law was substan-
tially impaired;" and § 16-3-20(C)(b)(7), "[t]he age or mentality of the defen-
dant at the time of the crime."

argument that his death sentence is disproportionate because of his alleged diminished personal culpability is therefore rejected. He concedes that the heinous nature of his crime easily compares with other cases in which the death sentence has been found warranted.

## IV. FAILURE TO CONSIDER MITIGATING EVIDENCE

As a final argument, Wilson claims error in the Count 1 and Count 2 sentencing orders of the lower court, which are virtually identical and provide:

On April 27, 1989, a sentencing proceeding in the above-entitled action was conducted by me as trial judge and was conducted without a jury. Now, having considered the evidence offered in aggravation, extenuation, and mitigation of punishment and having also considered the arguments presented for and against the imposition in this instance of a sentence of death upon the defendant James William Wilson, I therefore, have given consideration to and have found beyond a reasonable doubt the existence of the following statutory aggravating circumstances, to wit,

> Murder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct. Section 16-3-20(C)(a)(8).
> The murder of a child eleven years of age or under. Section 16-3-20(C)(a)(9);

and the following mitigating circumstances, to wit,

> The defendant has no significant history of prior criminal conviction involving the use of violence against another person. Section 16-3-20(C)(b)(1).
> The murder was committed while the defendant was under the influence of mental or emotional disturbance. Section 16-3-20(C)(b)(2).
> The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Section 16-3-20(C)(b)(6).
> The age or mentality of the defendant at the time of the crime. Section 16-3-20(C)(b)(7).

I have also considered any other possible mitigating circumstances and have found none.

> I have concluded that the defendant James William
> Wilson should be sentenced to death.

Wilson contends that the lower court's statement that, "I have considered any other possible mitigating circumstances and have found none" requires us to remand his case for re-sentencing, since it is clear from this statement that the lower court failed to consider the nonstatutory mitigating factor of Wilson cooperating with law enforcement. We disagree.

A reasonable reading of the lower court's order as a whole, with the challenged portion in context, clearly demonstrates that the lower court considered all mitigating evidence in the case. Early in the order, the lower court recites, "having considered the evidence offered in aggravation, extenuation, *and mitigation. . . .*" (emphasis added). Subsequently, the court notes that it has found the existence of the "following statutory aggravating circumstances . . .," and lists two of them. The court next states that it has considered and found the existence of "the following mitigating circumstances . . .," and lists four statutory mitigating circumstances. Although the court failed to modify the word "mitigating" with the adjective "statutory," as it did before listing the aggravating circumstances in its order, we hold the court clearly was merely listing statutory mitigating circumstances, and noting it found only four of them and no more. We refuse to accept Wilson's strained construction of the order.[12]

Accordingly, the defendant's sentence of death is

Affirmed.

GREGORY, C.J., and HARWELL and CHANDLER, JJ., concur.

FINNEY, J., dissenting in separate opinion.

FINNEY, Justice, dissenting:

I respectfully dissent. In my view, imposition of the death penalty upon a defendant found "guilty but mentally ill" is violative of the Cruel and Unusual Punishment Clause of the

---

[12] We observe that since the oral argument and briefing of this case, the Supreme Court of Delaware has issued an opinion which substantially conforms with our views here. *See Sanders v. State,* 585 A. (2d) 117 (Del. 1990) (holding that a defendant adjudicated as "guilty but mentally ill," in a statutory scheme similar to ours, may be sentenced to death).

Eighth Amendment of the United States Constitution. I would reverse.

The question before this Court is whether a person found to be guilty but mentally ill may constitutionally be sentenced to death for offenses he was helpless to prevent himself from committing; *id est*, as the result of an "irresistible impulse." My reading of the history of the pertinent legislative enactments convinces me it was not the intent of the General Assembly that such a sentence be imposed.

The Cruel and Unusual Punishment Clause is directed, in part, against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged. *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. (2d) 1140 (1982) (quoting *Weems v. United States*, 217 U.S. 349, 371, 30 S. Ct. 544, 550, 54 L. Ed. 793 (1910)). The eighth amendment mandates an individualized assessment of the appropriateness of the death penalty. *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. (2d) 256 (1989).

Mental illness is a mitigating factor which *must* be considered in death penalty cases. "For today, no less than before, we may seriously question the retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life." *Ford v. Wainwright*, 477 U.S. 399, 409, 106 S. Ct. 2595, 91 L. Ed. (2d) 335 (1986).

In accepting appellant's plea of guilty but mentally ill, the trial court found that at the time of the commission of the acts charged, appellant had the capacity to distinguish right from wrong as defined in S.C. Code Ann. § 17-24-10(A) (1976) but, because of mental disease or defect, the appellant lacked sufficient capacity to conform his conduct to the requirements of the law.

When considered in light of appellant's personal culpability, it becomes obvious that the penalty of death in this case is excessive; both in an absolute sense and when compared with other death sentences confirmed by this Court. This may be the only instance in South Carolina and indeed, according to my research, in the entire nation where the death penalty has been imposed after a factual determination that mental illness deprived the offender of sufficient capacity to conform his conduct to the standard required by law. I would find that this

sentence falls squarely within the ambit of relief contemplated by the proportionality review requirement of S.C. Code Ann. § 16-3-25(C)(3) (1976).

Society's "evolving standards of decency" imposes a presumption against execution of persons lacking sufficient capacity to conform their conduct to the standards of the law. The natural abhorrence civilized societies feel at killing one who has no capacity to come to grips with his own conscience or deity is still valid today. *Ford v. Wainwright, supra.*

I share the view that, due to appellant's mental illness, his sentence of death is opposed by a national consensus of sufficient uniformity and longstanding to render it cruel and unusual punishment within the meaning of the eighth amendment. *Thompson v. Oklahoma,* 487 U.S. 815, 108 S. Ct. 2687, 101 L. Ed. (2d) 702 (1988) (Scalia, J., dissenting). The eighth amendment analysis applied by the United States Supreme Court in assessing the constitutionality of the death penalty for rapists, *Coker v. Georgia,* 433 U.S. 584, 97 S. Ct. 2861, 53 L. Ed. (2d) 982 (1977), for nontriggermen, *Enmund v. Florida, supra,* and for offenders under the age of sixteen, *Thompson v. Oklahoma, supra,* establishes with clarity the impropriety of appellant's sentence. Though a rarity, imposition of the death penalty for the categories struck down in *Coker, Enmund* and *Thompson* was not alien to American jurisprudence. By contrast, I am unable to locate any record of a death sentence imposed under circumstances similar to that of the appellant's when an offender entered a plea of guilty but mentally ill.

I conclude that a person found to be mentally ill who, because of mental disease or defect, is unable to comprehend the criminality of his conduct or understand the punishment, should not be subjected to the penalty of death. I would find that under these circumstances, a death sentence amounts to cruel and unusual punishment in violation of the eighth amendment.

Based upon the record, appellant's death sentences should be reversed and mandatory life sentences imposed. At the very least, I would remand for resentencing so the record may reflect that due consideration has been accorded the additional mitigating circumstance of appellant's cooperation with law enforcement.