Elizabeth R. RIMERT, Conservator of Gary Alan Rimert, Incompetent, Appellant–Plaintiff,

v.

John F. MORTELL, Commissioner of Insurance of the State of Indiana, Appellee–Defendant,

and

M.I. Desai. M.D., and Legion Insurance Company, Nominal Appellees.

No. 49A02–9605–CV–293.

Court of Appeals of Indiana.

June 5, 1997.

Transfer Denied Oct. 6, 1997.

F. Boyd Hovde, Hovde Law Firm, Indianapolis, for Appellant–Plaintiff.

Mary J. Hoeller, Mark E. Walker, Lewis & Wagner, Indianapolis, for Appellees.

## OPINION

SULLIVAN, Judge.

Elizabeth R. Rimert (Betty), mother and conservator of Gary Alan Rimert (Gary), an incompetent, appeals the trial court's denial of her petition for payment of damages from the Patient's Compensation Fund (the PCF). She presents the following restated issues for our review:

(1) Does settlement of a medical malpractice claim by a health care provider under Indiana's Medical Malpractice Act bar a trial court, upon a petition for payment of excess damages from the Patient's Compensation Fund, from inquiring into the extent of the liability of the health care provider?

(2) May a plaintiff, who is imprisoned for life upon conviction of a crime, recover, from a tort-feasor, "loss of enjoyment of life" damages allegedly suffered as the result of his imprisonment? [1]

(3) Are legal fees, incurred to defend against criminal charges arising out of a criminal act, occasioned, at least in part, by medical malpractice, compensable damages?[1]

(4) May a plaintiff recover damages from a tort-feasor for the emotional distress alleged to have resulted from imprisonment upon conviction of a crime?[1]

In June of 1990, Dr. Judy Anderson diagnosed Gary as psychotic and recommended that he be hospitalized. On June 14, 1990, Dr. M.I. Desai admitted Gary into the Lafayette Home Hospital, where he was treated by Dr. Desai for nearly a month. Dr. Desai prescribed a variety of anti-psychotic medications for Gary, and released him into the custody of his parents on July 11, 1990.

On July 13, 1990, Betty agreed to allow Gary to use a family automobile on the condition that he take his medication and return between 6:00 and 6:30 p.m. for dinner. However, instead of returning home, Gary left Indiana and drove to his grandparents' home in South Carolina. On the morning of July 14, 1990, several hours after his arrival in South Carolina, Gary killed both of his grandparents and two of their neighbors by stabbing them with a kitchen knife. Gary was subsequently charged in South Carolina with four counts of murder. Gary pleaded not guilty by reason of insanity. He was found guilty but mentally ill on all four counts and was sentenced by the trial court to life imprisonment on each count. His conviction was affirmed by the Supreme Court of South Carolina. *State v. Rimert* (1994) 315 S.C. 527, 446 S.E.2d 400, *reh'g denied, cert. denied,* (1995) 513 U.S. 1080, 115 S.Ct. 730, 130 L.Ed.2d 634.

On March 27, 1992, Betty submitted to the Indiana Department of Insurance a proposed complaint for malpractice against Dr. Desai, claiming that Dr. Desai negligently discharged Gary from the Lafayette Home Hospital. Betty claimed that the four murders and Gary's subsequent imprisonment all resulted from Dr. Desai's alleged negligence. On January 31, 1994, Dr. Desai's insurance carrier settled Betty's claim for a total of $100,000, the maximum recovery permitted under the Medical Malpractice Act. Betty then filed a petition for payment of damages

---

**1.** Issues (2), (3), and (4) presuppose that the medical malpractice of the tort-feasor was a proximate cause of the injury for which the dam-

ages are claimed, or that proximate cause may not be litigated in a claim against the PCF.

in excess of the $100,000 from the PCF, seeking recovery for Gary's loss of enjoyment of life due to his imprisonment, for his legal defense fees, and for Gary's emotional distress. The PCF has been represented by counsel for the Commissioner of Insurance of the State of Indiana.

Following a bench trial, the court denied Betty's petition. The court held that the damages stemming from Gary's life imprisonment, including loss of enjoyment of life, criminal defense expenses, and emotional pain and suffering, were not compensable under Indiana law. The court also held, apparently in the alternative, that Dr. Desai's release of Gary was not the proximate cause of the murders or of Gary's imprisonment. (R. 84–95) Betty appeals the trial court's judgment.

Betty claims upon appeal that the trial court erroneously addressed Dr. Desai's liability for the requested damages by discussing the issue of proximate causation. Under the Indiana Medical Malpractice Act, I.C. 27–12–1–1 to 27–12–18–2 (Burns Code Ed.1994), once a health care provider files proof that it is insured by a policy of malpractice liability insurance in the amount of at least $100,000 per occurrence and $300,000 in the aggregate, I.C. 27–12–4–1, and pays an annual surcharge, I.C. 27–12–5–1, the provider is "qualified" and cannot be liable in a medical malpractice action for an amount greater than $100,000. I.C. 27–12–14–3(b). If a health care provider or his insurer settles its liability up to the maximum $100,000, the claimant may seek additional damages from the PCF. I.C. 27–12–15–3 provides:

> If a health care provider or its insurer has agreed to *settle its liability on a claim* by payment of its policy limits of one hundred thousand dollars ($100,000), and the claimant is demanding an amount in excess of that amount, the following procedure must be followed:
>
> (1) A petition shall be filed by the claimant ...:
>
> ...
>
> (B) Demanding payment of damages from the patient's compensation fund.
>
> ....

(4) The judge of the court in which the petition is filed shall set the petition for approval or, if objections have been filed, for hearing, as soon as practicable....

(5).... If the commissioner, the health care provider, the insurer of the health care provider, and the claimant cannot agree on the amount, if any, to be paid out of the patient's compensation fund, the court shall, after hearing any relevant evidence on the issue of claimant's damage submitted by any of the parties described in this section, determine the amount of claimant's damages, if any, in excess of the one hundred thousand dollars ($100,000) already paid by the insurer of the health care provider. The court shall determine the amount for which the fund is liable and make a finding and judgment accordingly. *In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established.* (emphasis supplied).

■ It is Betty's position that under the last sentence of I.C. 27–12–15–3(5), once a health care provider or its insurer agrees to settle a malpractice claim by payment of its policy limits of $100,000, neither the provider nor the insurer may contest the provider's liability in subsequent proceedings for excess payments from the PCF. Under the settlement agreement entered into between Betty and Dr. Desai's insurance carrier, the parties expressly agreed to "settle the liability of said Desai and his Insurer as to Plaintiff's claims...." Record at 23. Betty argues that since Dr. Desai's insurance carrier agreed to settle her claims against Dr. Desai, the trial court was obligated to consider Dr. Desai's liability as established. Betty further argues that a resolution of liability necessarily involves the resolution of issues of proximate causation, and that therefore the trial court should not have inquired into the extent to which Dr. Desai's negligence proximately caused the damages she seeks.

The Commissioner disagrees, claiming that a settlement of liability is, in effect, merely an admission of a negligent act, and is not an admission of proximate causation of damages

flowing from that act. We are not entirely unsympathetic to the logic of the Commissioner's argument. Under the Commissioner's reasoning, neither health care providers nor insurance carriers should, by deciding to settle a medical malpractice case, be able to unilaterally bind the PCF to the payment of damages, because settlement decisions may often be based upon factors unrelated to the strength of a plaintiff's case. Thus, the Commissioner appears to maintain that, if issues such as proximate causation could be relitigated in a hearing upon a petition for excess damages from the PCF, the PCF would not be obligated to pay damages that should not have been awarded in the first place.

However, this question was decided against the Commissioner in *Dillon v. Glover* (1992) Ind.App., 597 N.E.2d 971, *trans. denied.* In *Glover,* this court rejected a contention that I.C. 16–9.5–4–3, the predecessor of I.C. 27–12–15–3, merely equated the settlement of liability with an admission of the commission of a negligent act, and therefore permitted a trial court to determine whether this negligence proximately caused the claimed damages. We recognized that the question of proximate causation is a component of the greater concept of liability and that, therefore, if liability has been established, the issue of proximate causation has necessarily been decided. *Id.* at 973 (citing *Dunn v. Cadiente* (1987) Ind., 516 N.E.2d 52). The court concluded that once the provider's liability upon the claim has been settled, the statute prohibits the litigation of a health care provider's liability, thus foreclosing the issue of proximate causation. *Id.* As we stated in *Glover,* "[i]n our view the Statute contemplates that, upon a petition for excess damages, the trial court will determine the *amount* of damages, if any, due to the claimant, not *whether* the provider is liable for damages." (emphasis in original) *Id.* at 973 (footnote omitted). While the policy underlying the Commissioner's position is appealing, the Commissioner's arguments in this regard should be directed toward the legislature, whose statute clearly supports Betty's position.

■ Although the trial court erroneously determined that Dr. Desai did not proximate-

ly cause the damages sought by Betty, it appears that the trial court's dispositive holding was that the kind of damages requested are not compensable under Indiana law. While the trial court in a case such as this may not properly inquire into the liability of a health care provider, it may make a determination as to the compensable nature of the damages sought by a claimant. In *Eakin v. Kumiega* (1991) Ind.App., 567 N.E.2d 150, *trans. denied,* we held that a provider's settlement of liability did not require the PCF to compensate claimants for damages which are not of a legally compensable nature. Since the PCF is not required to pay legally non-compensable damages, we have determined that a settlement of liability does not render the requested damages legally compensable, *see Dillon v. Callaway* (1993) Ind. App., 609 N.E.2d 424, *trans. denied,* and that therefore a trial court may, in a case such as this, appropriately inquire into the compensable nature of injuries. *J.L. v. Mortell* (1994) Ind.App., 633 N.E.2d 300, *trans. denied.* The trial court therefore did not exceed its authority when it inquired into the compensable nature of the damages requested.

■ Thus, the issue before us is whether the trial court was correct in determining that the damages requested by Betty were not compensable under Indiana law. We note here that upon judicial review, a trial court's judgment may be affirmed upon grounds different from those reflected in the trial court's decision. *Kimberlin v. DeLong* (1994) Ind., 637 N.E.2d 121, *reh'g denied, cert. denied,* (1995) —— U.S. ——, 116 S.Ct. 98, 133 L.Ed.2d 53. This principle is not limited to summary judgment cases. *Thornton v. Pender* (1978) 268 Ind. 540, 377 N.E.2d 613. In other words, a trial court may get it right, but for the wrong reason. Here, the trial court's conclusion that the damages sought are not compensable was correct, but for reasons different from those advanced by the trial court.

■ It is a general rule of public policy that "a person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a

party ... [or] ... on a violation by himself of the criminal or penal laws...." 1A C.J.S. *Actions* § 29 (1985). This rule is based upon the sound policy objective that those who knowingly and intentionally engage in serious illegal acts should not be able to impose liability upon others for the consequences of their own behavior. Many jurisdictions have employed this general rule to bar actions seeking damages which were a direct result of the injured party's knowing and intentional participation in a criminal act. *See, e.g., Amato v. United States* (1982) D.N.J., 549 F.Supp. 863, *aff'd,* (1984) 3d Cir., 729 F.2d 1445 (no recovery against FBI by bank robber who was injured by gunfire during robbery on theory that FBI was negligent when, despite prior notice of robber's plan, FBI failed to arrest robber upon conspiracy charges prior to robbery); *Oden v. Pepsi Cola Bottling Co.* (1993) Ala., 621 So.2d 953 (no action for damages based on death of child who died when soft drink machine fell on him, since child was attempting to steal soft drinks from machine); *Lord v. Fogcutter Bar* (1991) Alaska, 813 P.2d 660 (no recovery against bar and bartender by intoxicated man who left bar with woman and was subsequently convicted for raping the woman later that night, on his theory that the bartender was negligent in serving him after he had become intoxicated); *Adkinson v. Rossi Arms Co.* (1983) Alaska, 659 P.2d 1236 (no action against manufacturer and seller of shotgun by man convicted of intentionally shooting a third person, on theory that shotgun was defectively designed); *Tate v. Derifield* (1994) Iowa, 510 N.W.2d 885, *reh'g denied* (no action for loss of consortium against police informant and drug task force by wife whose husband was lawfully incarcerated upon drug charges); *Orzel v. Orzel* (1995) 449 Mich. 550, 537 N.W.2d 208 (no recovery by drug user of damages alleged to have been caused by pharmacy's negligent filling of prescriptions, when drug user's action was based upon his repeated violations of drug laws); *Barker v. Kallash* (1984) 63 N.Y.2d 19, 479 N.Y.S.2d 201, 468 N.E.2d 39 (no recovery from supplier of gunpowder by parents of boy injured while making illegal pipe bomb); *Feltner v. Casey Family Program* (1995) Wyo., 902 P.2d 206 (no recovery against foster care program by natural son and parents for alleged damages arising out of son's conviction for sexual assault of a foster child placed in parent's care by program).

This general rule has also been applied by several jurisdictions under circumstances similar to those in this case. For example, in *Cole v. Taylor* (1981) Iowa, 301 N.W.2d 766, the Iowa Supreme Court was faced with a claim by a patient against her former psychiatrist, alleging that the psychiatrist negligently failed to prevent her from committing murder. The patient-plaintiff in *Cole* killed her ex-husband and was subsequently convicted of first-degree murder. She claimed that her psychiatrist learned of her violent inclinations and plans to kill her husband, but was negligent in failing to restrain the patient by hospitalization and failing to warn her ex-husband of her plans. The court held that the patient's claim should have been dismissed based upon the rule of public policy expressed above, noting that "plaintiff's responsibility for her criminal conduct was established by her conviction in the murder prosecution which we affirmed. It is that very criminal act which she claims as her damages, an element of recovery in this suit." *Id.* at 768. Therefore, according to the court, "it would be, plainly and simply, wrong as a matter of public policy to allow recovery." *Id.*

The same court was faced with a similar issue in *Veverka v. Cash* (1982) Iowa, 318 N.W.2d 447. In this case, Veverka had been convicted of five counts of felony murder, with arson as the underlying felony. Veverka sued his former psychiatrist, claiming that the doctor's negligent treatment and misdiagnosis resulted in Veverka's conviction and imprisonment. Veverka sought to avoid the implication of the *Cole* case by claiming that, while the plaintiff in *Cole* did not dispute her criminal guilt, Veverka, despite his criminal conviction, was in fact innocent based upon a theory of diminished capacity. *Id.* The court determined that since, in Iowa, arson and the "murder" for felony murder purposes are crimes of general intent, and the defense of diminished capacity does not apply to general intent crimes, Veverka's claimed diminished capacity would not be material to his guilt or

innocence. The court therefore determined that public policy barred Veverka's suit, and that the psychiatrist was entitled to judgment as a matter of law. *Id.* at 451.

The Michigan Court of Appeals dealt with this issue in *Glazier v. Lee* (1988) 171 Mich. App. 216, 429 N.W.2d 857. The plaintiff in *Glazier* shot and killed his girlfriend and was subsequently convicted of voluntary manslaughter. According to the plaintiff, the killing was caused by the failure of Dr. Robert E. Lee, plaintiff's former psychologist, to medicate or hospitalize him, and to warn the victim of plaintiff's dangerousness. The court relied upon the rule announced in *Cole, supra,* 301 N.W.2d 766, to bar plaintiff's claim as inconsistent with Michigan's public policy against shifting responsibility for the consequences of criminal acts to third parties. According to the Michigan Court of Appeals, the "controlling consideration" as to the applicability of this public policy bar was "whether plaintiff was responsible for the homicide." *Id.* 429 N.W.2d at 860. The court stated, "[i]t is plaintiff's own criminal responsibility which is determinative.... To allow plaintiff to proceed in the present civil action would allow plaintiff to shift the responsibility for his crime from himself to defendant. This we cannot do." *Id.*

Finally, in *Burcina v. City of Ketchikan* (1995) Alaska, 902 P.2d 817, the Alaska Supreme Court joined these jurisdictions in barring an action against mental health care providers by a former patient for damages stemming from the plaintiff's commission and conviction of a crime. In *Burcina,* the plaintiff claimed that negligent treatment by his mental health care providers caused him to set fire to a mental health care facility. The plaintiff ultimately pleaded *nolo contendere* to arson and was sentenced to prison. As in our case, the plaintiff in *Burcina* claimed damages for, among other things, mental and emotional distress and loss of enjoyment of life. The court, relying upon numerous Alaska cases, as well as upon *Cole, supra,* 301 N.W.2d 766 and *Glazier, supra,* 429 N.W.2d 857, held that the plaintiff's action was barred by Alaska's public policy against allowing individuals convicted of crimes from imposing civil liability upon others for the consequences of their own criminal conduct. *Burcina, supra,* 902 P.2d at 821.

This prohibition against actions based in whole or in part upon one's own criminal conduct is grounded upon the sound public policy that convicted criminals should not be permitted to impose or shift liability for the consequences of their own antisocial conduct. While Indiana has not expressly adopted the above policy, a bar against such actions is entirely consistent with the public policy expressed by our legislature and in our case law. For example, I.C. 29–1–2–12.1 (Burns Code Ed.1989) provides that a beneficiary of a life insurance policy who is convicted of murdering the policy holder is to be merely a constructive trustee as to the policy, and may not acquire any of the policy's proceeds. This is an expression of Indiana's longstanding and oft-expressed rule of public policy that one should not be permitted to profit from his or her wrongdoing. *See, e.g., Estate of Chiesi v. First Citizens Bank* (1992) Ind.App., 604 N.E.2d 3, *adopted,* (1993) Ind., 613 N.E.2d 14. Similarly, one who commits arson to gain the proceeds of an insurance policy is barred from recovery upon the public policy grounds that one should not be permitted to profit from such wrongdoing. *Iemma v. Adventure RV Rentals, Inc.* (1994) Ind.App., 632 N.E.2d 1178. This general rule has also been construed to mean that, in an action for damages, a reviewing court is to resolve all uncertainty as to the exact amount of damages against the wrongdoer whose tortious conduct has occasioned the damages. In *Fort Wayne v. Capehart–Farnsworth Corp.* (1957) 127 Ind.App. 412, 142 N.E.2d 442, a case in which the appellant defendant claimed that the plaintiff failed at trial to specifically prove its damages, the court explained that

> [i]t was the tortious act of appellant which created this situation and all doubts and uncertainties as to the proof of the exact measure of damages must be resolved against it. "... [A]ny other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.... The most elementary conceptions of justice and public policy require that the

wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Id.* 142 N.E.2d at 448 (quoting *Bigelow v. RKO Pictures, Inc.* (1945) 327 U.S. 251, 264–265, 66 S.Ct. 574, 580, 90 L.Ed. 652).

Betty argues that Gary is not seeking to "profit" from the killings; rather, Gary merely seeks to be compensated for losses he claims to have sustained as the result of Dr. Desai's negligence. We agree with Betty that when an individual seeks damages alleged to have been caused by the negligence of another, that individual is not seeking to "profit". Rather, the person is seeking to be made whole through compensation for a loss already sustained. Thus, we cannot say that Gary is attempting to "profit" from the killings.

Nevertheless, the rule against actions based upon or involving a plaintiff's criminal act is correlative with Indiana's public policy against permitting one to profit from his or her wrongdoing. Each embodies the principle that one who is responsible for the commission of a criminal or wrongful act must exclusively bear his or her share of the responsibility for the act, and may not evade that responsibility either through gaining some profit for the act or shifting liability for the act to another. We therefore hold it to be the public policy of this state that an individual who has been convicted of a crime should be precluded from imposing liability upon others, through a civil action, for the results of his or her own criminal conduct. Consequently, a person may not maintain an action if, in order to establish the cause of action, he or she must rely, in whole or in part, upon an illegal act or transaction to which he or she is a party or upon a violation by him or herself of the criminal laws.

We note here an important limitation to this public policy bar. The cases cited above uniformly hold that one may not shift liability for the consequences of one's own criminal act to another through the prosecution of a civil action which seeks to recover damages which are the result of the plaintiff's own criminal act. All of the above-cited cases indicate that the plaintiff's responsibility for the criminal act is, as the Michigan Court of Appeals stated in *Glazier, supra,* 429 N.W.2d

at 860, the "controlling consideration" as to the imposition of this bar. A problem arises, however, when it is unclear whether the plaintiff is in fact legally responsible for the criminal act in question.

For example, the Illinois Court of Appeals in *Boruschewitz v. Kirts* (1990) Ill.App., 197 Ill.App.3d 619, 144 Ill.Dec. 73, 554 N.E.2d 1112, *appeal denied,* 133 Ill.2d 552, 149 Ill. Dec. 316, 561 N.E.2d 686, suggested that, to the extent that a plaintiff was not responsible for the underlying criminal act by reason of legal insanity, the plaintiff's action would not be barred as violative of public policy. In *Boruschewitz,* the plaintiff shot and killed two people and entered a plea of guilty but mentally ill. The plaintiff sued her former mental health care providers, claiming that their negligence caused her mental condition to deteriorate to the point that she could not conform her conduct to the requirements of the law, and ultimately led to the killings. The trial court had dismissed the claim as contrary to the public policy expressed above. The court of appeals, however, disagreed and distinguished the cases of *Cole, supra,* 301 N.W.2d 766, and *Glazier, supra,* 429 N.W.2d 857, on the grounds that, unlike in those cases, the plaintiff in *Boruschewitz* specifically claimed in her civil complaint that she was legally insane at the time of the killings, and was therefore not responsible for the killings. Despite the plaintiff's plea and the criminal trial court's finding of guilty but mentally ill, a determination that in Illinois does not relieve an individual of criminal responsibility for his or her conduct, ILL.REV. STAT. ch. 38, para. 6–2(c), the court of appeals held that the plaintiff must be allowed the opportunity in her civil suit to demonstrate that she was legally insane. *Boruschewitz, supra,* 144 Ill.Dec. at 75, 554 N.E.2d at 1114.

As the Illinois Court of Appeals in *Boruschewitz, supra,* 144 Ill.Dec. 73, 554 N.E.2d 1112 intimates, the public policy bar enunciated in our opinion should not operate to preclude an action based upon or involving an ostensibly criminal act to the extent that the plaintiff was not in fact responsible for the act. A prohibition against imposing liability for one's own criminal acts to another through a civil action is simply not justified

when a plaintiff is not responsible for the act or acts in question. Thus, if in this case Gary had been found not guilty by reason of insanity, he would bear no criminal responsibility for his acts and his subsequent civil action for recovery against the PCF could not be barred by the public policy expressed above.

However, Gary was found guilty but mentally ill upon the four counts of murder. A conviction upon a finding of "guilty but mentally ill" raises questions about the extent of an individual's criminal culpability. An unqualified finding of guilt clearly involves a finding of full criminal responsibility. Conversely, a finding of not guilty by reason of insanity plainly indicates the absence of criminal culpability. The finding of guilty but mentally ill, however, appears to implicate some lesser degree of criminal culpability. To the extent that our criminal law seeks to punish only the criminally culpable, the punishment of mentally ill offenders who possess some reduced degree of criminal culpability seems problematic, if not wholly anomalous under our system of justice. Nevertheless, Gary's conviction, despite its misleading label, contemplates complete criminal responsibility for the killings.

Because Gary was convicted in South Carolina, we must look to the law of that state to determine the extent of his criminal culpability. The South Carolina Code states, in regard to the insanity defense, that:

> [i]t is an affirmative defense to a prosecution for a crime that, at the time of the commission of the act constituting the offense, the defendant, as a result of mental disease or defect, lacked the capacity to distinguish moral or legal right from moral or legal wrong or to recognize the particular act charged as morally or legally wrong.

S.C. CODE ANN. § 17–24–10(A)(1996 Cum. Supp.). This standard is very similar to Indiana's insanity defense. I.C. 35–41–3–6. With regard to a verdict of guilty but mentally ill, the South Carolina Code states:

> [a] defendant is guilty but mentally ill if, at the time of the commission of the act constituting the offense, he had the capacity to distinguish right from wrong or to recog-

nize his act as being wrong as defined in Section 17–24–10(A), but because of mental disease or defect he lacked sufficient capacity to conform his conduct to the requirements of the law.

S.C. CODE ANN. § 17–24–20(A)(1996 Cum. Supp.). In South Carolina, individuals found guilty but mentally ill must be sentenced the same as those simply found guilty, except that those found guilty but mentally ill are first sent to a treatment facility, and are released into the general prison population once the treatment facility determines that it is safe to do so. S.C. CODE ANN. § 17–24–70(A)(1996 Cum.Supp.).

According to the South Carolina Supreme Court, a finding of guilty but mentally ill contemplates the same degree of culpability as an unqualified finding of guilt. In *State v. Wilson* (1992) 306 S.C. 498, 413 S.E.2d 19, *cert. denied* (1992) 506 U.S. 846, 113 S.Ct. 137, 121 L.Ed.2d 90, the court determined that an individual found guilty but mentally ill of murder for actions taken while under an "irresistible impulse" could constitutionally be sentenced to death. The court noted that in South Carolina, the only way a criminal defendant may be absolved of criminal liability is through the successful demonstration of legal insanity, and that the "irresistible impulse" theory has no place as a part of the state's insanity defense. *Id.* 413 S.E.2d at 24. Therefore, according to the South Carolina Supreme Court, even though the defendant claimed to have been acting under an "irresistible impulse" and was therefore mentally ill, "under South Carolina law, [a guilty but mentally ill individual] is just as culpable as any other guilty defendant. Hence, there is no diminishment in his 'personal responsibility and moral guilt.'" *Id.* 413 S.E.2d at 25 (quoting *Enmund v. Florida* (1982) 458 U.S. 782, 801, 102 S.Ct. 3368, 3378, 73 L.Ed.2d 1140).

■ One might wonder why a jury should have the option to find a defendant either guilty or guilty but mentally ill when both verdicts contemplate the same degree of criminal culpability. One might validly argue that a verdict of guilty but mentally ill is an illusory recognition of one's diminished ca-

pacity, rendering the actual degree of culpability meaningless. Nevertheless, the South Carolina Supreme Court, in *Rutherford v. Rutherford* (1992) 307 S.C. 199, 414 S.E.2d 157, reaffirmed its position that an individual's mental illness which does not establish legal insanity has no bearing upon criminal responsibility, and explained that the mental illness of one found guilty but mentally ill "is considered only to determine where the defendant shall serve his or her sentence." *Id.* 414 S.E.2d at 161. It is thus clear that South Carolina considers individuals convicted upon a finding of guilty but mentally ill to possess the same degree of legal responsibility for their crimes as those simply found guilty. Therefore, even though Gary was found to be guilty but mentally ill, he was adjudicated by the state of South Carolina to possess full criminal responsibility for the killings.

South Carolina's adjudication of Gary's responsibility for the crimes is dispositive of the issue of his criminal responsibility in this action. It is true that a criminal conviction, while admissible as evidence in a civil trial, may not be conclusive proof in a civil action of the factual issues determined by the criminal judgment. *Kimberlin, supra,* 637 N.E.2d 121. However, it is also true that an individual may be collaterally estopped from relitigating a fact or issue which was necessarily adjudicated in a prior action when the party in the prior action had a full and fair opportunity to litigate the issue and when it is otherwise fair to apply collateral estoppel to the facts of the particular case. *Id.* In *Kimberlin,* our Supreme Court determined that an individual's criminal trial, which resulted in convictions which were subsequently affirmed upon appeal, afforded him a sufficient opportunity to litigate disputed issues such that it was entirely fair to collaterally estop him from relitigating those issues within the context of a civil action. *Id.*

The same result obtains here. Gary zealously defended against his criminal charges. However, he was found, beyond a reasonable doubt, to possess full criminal responsibility for the murders. Gary had ample opportunity to demonstrate his lack of criminal responsibility for the murders under the shield of a standard of proof far more protective than the civil preponderance of evidence standard. Thus, as the court stated in *Kimberlin, supra,* 637 N.E.2d 121, "[u]nder these circumstances, the application of collateral estoppel is not unfair." *Id.* at 125. Therefore, Gary may not successfully claim that his action should survive the public policy bar because his mental condition rendered him not fully responsible for the killings.

In conclusion, an individual may not maintain an action if it is based in whole or in part upon an illegal transaction to which the plaintiff is a party or upon the plaintiff's own violation of the criminal laws. This bar does not operate to the extent that the individual is not responsible for the criminal act or acts in question. Betty's action on Gary's behalf seeks damages for Gary's legal defense costs and subsequent imprisonment stemming from the murders for which he was convicted. Betty's cause of action is, in short, that but for Dr. Desai's negligence, Gary would not have killed his grandparents and two others, and would therefore not have faced prosecution, conviction and incarceration for the crimes. As noted above, Gary was found to be criminally responsible for the murders. Moreover, Gary is estopped from claiming that the public policy bar should not preclude his action upon the theory that his mental condition renders him not criminally responsible for the crimes. The petition for excess damages from the PCF is predicated upon a criminal act for which Gary has been found fully responsible and is therefore barred as a matter of public policy.

The judgment of the trial court is affirmed.

STATON and NAJAM, JJ., concur.