669 S.E.2d 640

**The STATE, Respondent,**

v.

**Onrae WILLIAMS, Appellant.**

**No. 4447.**

Court of Appeals of South Carolina.

Heard Sept. 18, 2008.

Decided Oct. 22, 2008.

Rehearing Denied Dec. 19, 2008.

Mark A. Peper, of Charleston, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia; and Solicitor Scarlett Wilson, of Charleston, for Respondent.

HUFF, J.:

Onrae Williams was convicted of distribution of crack cocaine and distribution of crack cocaine within proximity of a school. Based upon two prior "serious" convictions, the trial court sentenced Williams to life imprisonment without the possibility of parole on both charges. On appeal, Williams asserts error in (1) the trial court's refusal to allow him to impeach the testimony of the confidential informant with evidence of several former convictions that were older than ten years and (2) the trial court's sentencing of him to life without parole (LWOP) in violation of his constitutional protection from cruel and unusual punishment. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

This case involves a controlled buy set up by the City of Charleston Police Department using a confidential informant (CI). On August 10, 2004, officers met with the CI, searched him to insure he had no contraband on his person, provided him with money, and equipped him with a button camera capable of capturing video. Because there had been numerous complaints about drug activity near Harmon Park, the CI was taken close to that area with a bicycle, which the CI then used to ride into the area. Following along with the videotape of the incident admitted into evidence, Officer Womack indicated where the CI came in contact with someone, and ultimately completed a drug transaction approximately one hundred yards away from Burke High School. Officer Womack testified he maintained a constant visual on the CI during the entire process, as well as a constant audio transmission. When the informant was searched before being let out to make the buy, he had no drugs on him. When he returned, the CI had crack cocaine in his hand.

Officer Hurteau, who was present with Officer Womack at the controlled buy, also testified as the video of the incident was played to the jury. He testified the CI was not working off charges, but was a paid informant. Officer Hurteau pointed out on the video an individual on a fence who was talking on a cell phone and yelled out "Onrae," and that one could then observe Williams walking up from the fence area. He then noted where the CI hands Williams money. Williams is off the camera for a moment and then reappears, approaching the CI, at which point Williams is referred to as "On." Williams is seen holding something in his hand, which he places in the CI's hand, and then walks away. When the CI returned to Officer Hurteau's location, he handed him two, off-white rock-like substances. Officer Jenkins, who was also present in the area, testified he was on perimeter duty during the controlled buy and he observed Williams with another man near the fence as the CI approached the area. After reviewing the video of the incident, Officers Hurteau and Womack, as well as Officer Jenkins, "all immediately without hesitation recognized him and said that was Onrae Williams."

The CI also testified to the events of that day. As with Officers Womack and Hurteau, he followed along with the videotape of the event, identifying Onrae Williams on the tape and noting the completion of the transaction where Williams handed him drugs in exchange for money. He testified that after Williams handed him the drugs, he got back on the bicycle and rode back to the police officers and gave them the drugs. The CI confirmed that the officers searched him before the transaction, as well as upon his return. Subsequent analysis of the item showed it to be .3 grams of crack cocaine.

At the start of the case, Williams made an in limine motion seeking to admit evidence of several prior convictions of the CI that were greater than ten years old. Specifically, Williams sought to introduce evidence of the CI's 1988 conviction for armed robbery, for which he was released from prison on August 1, 1996, as well as several forgeries and a larceny that occurred around 1981 and 1982. Williams argued the CI's credibility was key to the trial as the video was not completely clear, and that under Rule 609(b), SCRE, the jury should have this information in the interest of justice. Williams also noted the CI had a 2002 conviction for receiving stolen goods, showing the CI has continued to break the law. Finally, Williams maintained that the matter had been pending for about a year, and had the State tried the case within the first six months, the armed robbery conviction would have fallen within the ten year limit under the rule. He argued it was the State's delay in bringing the case that caused the ten-year period to expire between the time of his arrest and the trial, as his arrest occurred in January 2005, a time within the ten-year period. Williams acknowledged, however, that he had not made a motion for a speedy trial.

The trial court noted Williams would be able to challenge the CI's credibility with the prior conviction for receiving stolen goods. It found no reason under the facts of this case to extend the time limit for the other convictions beyond the cut-off date under the rule, but stated it would rule on the matter after Williams proffered the evidence.

During the CI's direct examination, he admitted to having a 2002 conviction for receiving stolen goods. During the CI's

cross-examination, counsel questioned why the CI would become a confidential informant. The CI stated it was "[t]o try to keep 'em from hurting people," and that it was not always about the money he received. Counsel then asked the CI about his conviction for receiving stolen goods and asked whether that did not hurt people as well. Counsel continued with this line of questioning, asking how long the CI had been working as a confidential informant at which point the following colloquy occurred:

[Counsel]: But it had nothing to do with the money?

[CI]: No, it ain't about the money. I had money, you know. It was about the drug deals. I figure it's about time to make a change now. I've done spent half of my life in the penitentiary.

[Counsel]: You've spent half your life in prison?

[CI]: Yeah.

[Counsel]: And now you've turned your life around?

[CI]: Trying to.

[Counsel]: It was time to make a change?

[CI]: It was time to make a change, for sure.

[Counsel]: You're an honest man now?

[CI]: I ain't going to say honest because I trip up sometimes.

Thereafter, defense counsel asserted the CI opened the door to testimony concerning his older prior convictions when he stated he had spent half of his life in the penitentiary. The court noted Williams had already received a benefit by that answer to the question, and still found no exceptional circumstances in light of the CI's testimony that would warrant allowing convictions outside the time limit, but allowed counsel to proffer the evidence. Outside the jury's hearing, the CI admitted he had a 1988 conviction for armed robbery for which he served time and was released in August 1996. He further acknowledged a 1982 larceny conviction resulting in a two-year sentence, suspended to six months, as well as some forgeries and a housebreaking conviction in 1982 for which he received a ten-year sentence. The solicitor objected to introduction of the prior convictions, arguing it was not probative, it was unduly prejudicial, and defense counsel had already

accomplished his goals through the testimony he elicited from the CI. The trial court ruled the circumstances did not warrant allowing the older prior convictions, and the issue was resolved by the CI's answers on cross-examination.

The jury found Williams guilty of the distribution and proximity charges. The solicitor stated Williams had several previous convictions, including a 2000 possession with intent to distribute cocaine and a proximity charge, as well as a possession of crack charge, and in 2003 had distribution of marijuana, distribution of cocaine, proximity, and possession of cocaine charges. The court noted Williams had at least two previous serious offenses such that this offense would qualify as a third. Defense counsel agreed and further stated he did not believe the court had "much discretion" as far as sentencing, but placed an objection on the record to a life without parole sentence. Counsel maintained such a sentence would constitute cruel and unusual punishment as this was a drug crime and not a violent crime. He argued, in this case, life without parole would be excessive, unduly severe, and would violate the due process clause. The court sentenced Williams to life without parole on both offenses. This appeal followed.

## LAW/ANALYSIS

### A. Prior remote convictions

■ Williams first contends the trial court erred by refusing to allow evidence of the CI's former convictions for armed robbery, larceny, forgery and housebreaking. He argues the trial court erred in failing to admit this evidence because (1) the CI opened the door to the evidence by stating he spent half his life in prison and (2) the court failed to apply the proper balancing test in ruling Williams could not challenge the CI's credibility pursuant to Rule 609, SCRE. We find no reversible error.

■ The admission or exclusion of evidence falls within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *State v. Morris*, 376 S.C. 189, 205, 656 S.E.2d 359, 368 (2008). As well, the scope of cross-examination is within the discretion of the trial court, and the court's decision will not be reversed on appeal

absent a showing of prejudice. *State v. Colf,* 337 S.C. 622, 625, 525 S.E.2d 246, 247–48 (2000). Further, any error in the trial court's failure to conduct the proper balancing test in determining whether remote convictions are admissible may be harmless. *State v. Johnson,* 363 S.C. 53, 60, 609 S.E.2d 520, 524 (2005). To constitute error, the trial court's ruling to admit or exclude evidence must affect a substantial right. *Id.*; Rule 103(a), SCRE. Error is considered harmless where it could not reasonably have affected the outcome of the trial. *State v. Bryant,* 369 S.C. 511, 518, 633 S.E.2d 152, 156 (2006). "Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result. Thus, an insubstantial error not affecting the result of the trial is harmless where a defendant's guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached." *Id.* (citations omitted). In determining whether error is harmless, the circumstances of each individual case are to be considered. *Id.*; *Johnson,* 363 S.C. at 60, 609 S.E.2d at 524.

Even assuming arguendo that the trial court failed to apply the proper balancing test or that the court erred in refusing to admit the evidence based on the CI's opening door, we find any such error would be harmless. Here, contrary to Williams' assertion, the CI was not the only witness for the State who could identify him and place him at the scene. Officer Hurteau testified, while following the videotape, that you could hear an individual at the scene yelling out the name "Onrae," and at a later point on the tape noted Williams is referred to as "On." He further indicated you could observe Williams on the videotape and also could see Williams holding a small substance in his hand, which he places in the CI's hand. Officer Jenkins, who was on perimeter duty during the controlled buy, testified he observed Williams with another man near the fence as the CI approached the area. Officer Womack testified he maintained a constant visual on the CI during the entire process, and that the CI was searched before being let out to make the buy and had no drugs on him, but had crack cocaine in his hand when he returned. Finally, after reviewing the video of the incident, Officer Hurteau testified he and Officer Womack, as well as Officer Jenkins, all

immediately and without hesitation recognized Onrae Williams as the individual who sold the drugs to the CI.[1]

Further, the CI was already impeached with admission of his conviction of receiving stolen goods, a crime the CI acknowledged before the jury was a crime of dishonesty. The CI's credibility was clearly called into question by this, along with his admission he had spent half of his life in the penitentiary and his refusal to characterize himself as honest. *See State v. Cooper,* 312 S.C. 90, 92, 439 S.E.2d 276, 277 (1994) (holding any error in excluding evidence of witness' prior bad acts harmless, where witness was thoroughly impeached by admission of numerous previous convictions and acknowledgment his testimony was given for favorable treatment on pending charges), *overruled in part on other grounds by Franklin v. Catoe,* 346 S.C. 563, 575, 552 S.E.2d 718, 725 (2001); *State v. Tillman,* 304 S.C. 512, 520, 405 S.E.2d 607, 612 (Ct.App.1991) (finding, where witness was thoroughly impeached by admission of numerous prior convictions and his acknowledgment that he was testifying under an agreement to receive favorable treatment on some outstanding charges, any error in excluding evidence of a particular crime he might have committed was harmless).

Aside from the CI's testimony, there is evidence of record placing Williams at the scene and identifying him as the individual engaged in the drug transaction with the CI. There is also evidence showing the CI, while under constant visual, returned with drugs that he did not have when he left the officers. Given all this evidence, along with the fact that the CI was thoroughly impeached by evidence of his crime of dishonesty and his admissions he had spent half of his life in jail and that he would not characterize himself as honest, we find exclusion of the CI's remote convictions could not reasonably have affected the result of the trial. Considering the circumstances of this case, we therefore conclude any possible error in the exclusion of the evidence is harmless.

## B. LWOP sentence

Williams next contends the trial court erred in sentencing him to life in prison without parole in violation of his

---

1. We note our review of the video exhibit supports the officers' testimony.

constitutional protection from cruel and unusual punishment. He asserts, under *State v. Pittman,* 373 S.C. 527, 647 S.E.2d 144 (2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1872, 170 L.Ed.2d 751 (2008), the two principles to consider in determining whether a punishment is cruel and unusual are (1) the evolving standards of decency that mark the progress of a maturing society and (2) the proportionality between the punishment and the offense. He argues an LWOP sentence for distribution of less than half a gram of a controlled substance is inconsistent with evolving standards of contemporary values. Williams further asserts an LWOP sentence under the recidivist statute is grossly disproportionate to the punishment deserved for distribution of less than half a gram of cocaine, especially where the first conviction used to qualify him for LWOP was committed as a juvenile. We disagree.

Section 17–25–45(B) of the South Carolina Code requires that "upon a conviction for a serious offense . . . a person must be sentenced to a term of imprisonment for life without the possibility of parole if that person has two or more prior convictions for: (1) a serious offense." S.C.Code Ann. § 17–25–45(B) (2003).

■ The Eighth Amendment to the United States Constitution provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. XIII. The cruel and unusual punishment clause requires that the duration of a sentence not be grossly disproportionate with the severity of the crime. *State v. McKnight,* 352 S.C. 635, 652, 576 S.E.2d 168, 177 (2003).

■ Most recently, our courts have recognized that "what constitutes cruel and unusual punishment, and thus, what violates the Eighth Amendment, is determined by 'evolving standards of decency that mark the progress of a maturing society.'" *State v. Pittman,* 373 S.C. 527, 562, 647 S.E.2d 144, 162 (2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1872, 170 L.Ed.2d 751 (2008) (quoting *State v. Standard,* 351 S.C. 199, 204, 569 S.E.2d 325, 328 (2002)). In implementing this test, the court looks to objective evidence of how our society views a particular punishment today. *State v. Wilson,* 306 S.C. 498, 509–10, 413 S.E.2d 19, 26 (1992). Legislation enacted by the

country's legislatures is the "clearest and most reliable objective evidence of contemporary values." *Pittman*, 373 S.C. at 563, 647 S.E.2d at 162. "[T]he Constitution requires the court's own judgment to be brought to bear on the issue by 'asking whether there is reason to disagree with the judgment reached by the citizenry and its legislators.'" *Id.* at 563, 647 S.E.2d at 163 (quoting *Atkins v. Virginia*, 536 U.S. 304, 313, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)). It is not the burden of the state to establish a national consensus approving what their citizens have voted to do; rather, it is the heavy burden of the defendant to establish a national consensus against it. *Wilson*, 306 S.C. at 510, 413 S.E.2d at 26.

▮▮▮▮ Additionally, the "'proportionality' bedrock of Eighth Amendment jurisprudence" is equally important a principle as the "evolving standards of decency," and "'it is a precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" *Pittman*, 373 S.C. at 564–65, 647 S.E.2d at 163 (quoting *Atkins*, 536 U.S. at 311, 122 S.Ct. 2242). In order to establish that evolving standards of decency preclude his punishment, appellant bears the "'heavy burden' of showing that our culture and laws emphatically and well nigh universally reject it." *Id.* at 565, 647 S.E.2d at 164 (quoting *Harris v. Wright*, 93 F.3d 581, 583 (1996)).

In *State v. Standard*, 351 S.C. 199, 569 S.E.2d 325 (2002), our supreme court found, based upon sentences imposed in other cases, that lengthy sentences or sentences of life without parole imposed upon juveniles do not violate contemporary standards of decency so as to constitute cruel and unusual punishment, and that an enhanced sentence based upon a prior "most serious" conviction for a crime which was committed as a juvenile does not offend evolving standards of decency so as to constitute cruel and unusual punishment. *Id.* at 205–06, 569 S.E.2d at 329. Accordingly, Standard's sentence of LWOP based on a previous "most serious" armed robbery conviction when he was seventeen and his subsequent "most serious" conviction of burglary in the first degree did not violate the Eighth Amendment.

▮▮▮▮ Our courts have also determined stiff penalties for drug crimes do not violate the constitutional prohibition

against cruel and unusual punishment. *See State v. Brown,* 303 S.C. 169, 172, 399 S.E.2d 593, 594 (1991) (holding sentence of 25 years without parole upon conviction of trafficking in cocaine was not cruel and unusual punishment); *State v. Kiser,* 288 S.C. 441, 443–44, 343 S.E.2d 292, 293 (1986) (holding mandatory minimum sentence of 25 years in prison for trafficking in marijuana was not grossly out of proportion with severity of crime and, therefore, complied with cruel and unusual punishment clause). Additionally, in considering the implications of drugs on our society today, the United States Supreme Court has noted as follows:

> Possession, use, and distribution of illegal drugs represent "one of the greatest problems affecting the health and welfare of our population." Petitioner's suggestion that his crime was nonviolent and victimless, echoed by the dissent, is false to the point of absurdity. To the contrary, petitioner's crime threatened to cause grave harm to society.

> Quite apart from the pernicious effects on the individual who consumes illegal drugs, such drugs relate to crime in at least three ways: (1) A drug user may commit crime because of drug-induced changes in physiological functions, cognitive ability, and mood; (2) A drug user may commit crime in order to obtain money to buy drugs; and (3) A violent crime may occur as part of the drug business or culture. Studies bear out these possibilities and demonstrate a direct nexus between illegal drugs and crimes of violence.

*Harmelin v. Michigan,* 501 U.S. 957, 1002–03, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (citations omitted). Finally, the United States Supreme Court has also held a state is justified in punishing a recidivist more severely than it does a first offender. *Riggs v. California,* 525 U.S. 1114, 119 S.Ct. 890, 891, 142 L.Ed.2d 789 (1999). Under recidivist sentencing schemes, the enhanced punishment imposed for a present offense is not to be viewed as an additional penalty for the earlier crimes, but instead as a stiffened penalty for the latest crime, which is considered to be an aggravated offense because it is a repetitive one. *Id.*

In light of our court's decisions in finding sentences of LWOP imposed upon juveniles do not violate contemporary standards of decency so as to constitute cruel and unusual

punishment and that an enhanced sentence based upon a prior "most serious" conviction for a crime which was committed as a juvenile does not offend evolving standards of decency so as to constitute cruel and unusual punishment, that stiff penalties for drug crimes do not violate the constitutional prohibition against cruel and unusual punishment, and in consideration of the implications of drugs on our society today as noted by the United States Supreme Court in *Harmelin*, combined with the United States Supreme Court's determination that a State is justified in punishing a recidivist more severely than it does a first offender, we find Williams has failed to meet his burden of establishing evolving standards of decency preclude his punishment, or that his sentence is disproportionate to the crime.

For the foregoing reasons, Williams' convictions and sentences are

**AFFIRMED.**

HEARN, C.J., and GEATHERS, J., concur.