770 S.E.2d 424

**The STATE, Respondent,**

v.

**Marvin Bowens GREEN, Appellant.**

**Appellate Case No. 2012–212739.**

**No. 5302.**

Court of Appeals of South Carolina.

Heard Jan. 8, 2015.
Decided March 11, 2015.
Rehearing Denied April 21, 2015.

Appellate Defender Susan Barber Hackett, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General Jennifer Ellis Roberts, both of Columbia; Amie L. Clifford, of the South Carolina Commission on Prosecution Coordination, of Columbia; and Solicitor Scarlett Anne Wilson, of Charleston, all for Respondent.

LOCKEMY, J.

Marvin Bowens Green was convicted of possession of a weapon during the commission of a violent crime (possession of a weapon) and armed robbery. The trial court sentenced him concurrently to five years' imprisonment for possession of a weapon and life imprisonment without the possibility of parole (LWOP) for armed robbery. Green appeals, arguing the trial court erred in (1) not giving the jury specific instructions concerning how to analyze identification evidence; (2) allowing the State to introduce his "mug shot"; and (3) sentencing him to LWOP in violation of the Eighth Amendment's ban on cruel and unusual punishment. We affirm.

**FACTS**

On December 24, 2010, a man entered Natubhai Patel's (Victim's) convenience store and robbed him at gunpoint. At trial, Victim testified the man was "wearing sunglasses, a red hat, a black jacket, and khaki pants." He recognized the man as a regular customer he had known for approximately one year, who came into his store three times a week to purchase cigarettes, gas, and lottery tickets. Victim explained he and the man had a running joke about President Barack Obama's signature being on the man's identification. Victim identified Green in court as the man who robbed him. According to Victim, the police arrived at the store after the robbery and viewed surveillance video of the robbery with him. Thereafter, the trial court admitted the surveillance video without objection.

Detective Charles Lawrence investigated the robbery. He reviewed the surveillance video and recognized the perpetrator as Green. Detective Lawrence knew Green and was able to identify him as the robber because of Green's "walk, height, weight[,] and structure of his face." He explained Green had a distinctive nose that led him to identify Green as the man in the video. Detective Lawrence asserted he was 100% positive Green was the man in the surveillance video. After he identified Green as the robber, Detective Lawrence generated a six-person photo line-up and arranged to meet with Victim to see if he could identify the man who robbed him. According to Detective Lawrence, Victim identified Green as the robber

in a photographic line-up. The trial court admitted the line-up photo of Green over his objection.

The State then asked to hold a bench conference outside the presence of the jury. It moved to admit a "booking photo" of Green (the booking photo) that was taken following his arrest for the robbery. The State argued the booking photo was relevant because

[i]t shows [Green's] side profile, it's from when he was arrested from this instance so it's not a prior incident. It has nothing to do with [Rule] 404(b)[, SCRE,] but it's relevant so the jury can see him and be able to look at this and look at the [surveillance] video.

Green objected, arguing it was reversible error to admit a "booking photo" and the following colloquy occurred:

[The State]: I don't have a problem if you want me to cut those photos, cut the top half off.

[Green]: Yeah, but, I mean, it still shows it's a booking photo.

The Court: Let's just mark it for identification.

Thereafter, the State moved to admit the booking photo, and Green objected under Rule 404(b). The trial court overruled the objection and admitted the photo as State's Exhibit 5, but it did not allow the State to publish the photo to the jury at that time.

SLED investigator Joseph West testified he obtained still photographs from the surveillance video of the robbery. The trial court admitted the still photos over Green's objection.

Jagruti Patel, Victim's wife, testified she recognized the man in the surveillance video as a regular customer who often came into the store to buy cigarettes, lottery tickets, and gas. She recalled him joking about President Obama signing his driver's license. Patel identified Green in court as the man in the video.

After the State rested, Green asked for clarification regarding the trial court's ruling on the booking photo. The trial court noted it admitted the photo earlier but did not allow the State to publish it to the jury. The court explained the State planned to submit a redacted, color copy of the photo that was enlarged so that it was "in conformity" with "all the other

paper page sizes." Green renewed his objection to the booking photo, and the following exchange occurred:

[Green]: And we believe we have sort of a front picture, side pictures. Any ... reasonable juror can infer that's a booking photo.

The Court: But that's not standard, is it? That's not what I'm concerned with. We can infer anything from anything and the case that you provided indicates that it was a different type of photo. It was the actual booking photo. We all know that [Green] was arrested and there was indication that he was booked, and the case that you provided me ... the date was around his neck on his booking photo, which was prior to the arrest that he was being tried for.[1]

[Green]: Yes, [y]our Honor. Basically, when you look at the three factors in the case we don't believe the [State] need[s] to introduce the photograph.

The Court: The reason that [the State] indicated to the [c]ourt that they needed [the booking photo] is because they needed a side profile picture. When we approached at the bench there was a discussion, because I'm not sure if it was on the record, there was a discussion on what would be admissible.

Mr. Groeber indicated that his major objection was to the top and to the bottom row because it clearly then indicated that it came from Charleston County. There's absolutely no distinguishing marks on the remaining two photographs. There's nothing to indicate that ... [Green is] in a jail suit or anything around the neck as in the case that you provided, and so I made the decision to cut the top and the bottom off of those pictures. So back to my initial question, Mr. Grimes.

[Green]: Yes, ma'am.

The Court: They have a larger picture of what I have had redacted. Okay. So it's now—that picture is a full page. There was an objection because during the redaction now it's a smaller page.

[Green]: Yes, ma'am.

---

1. The record does not reveal what case the trial court was referring to.

72

The Court: So which would you prefer me, preserving all of your objections, give the bigger page so that it's in conformity with all the other paper page sizes or the smaller page that's black and white?

[Green]: Preserving everything we prefer the bigger photo to go back.

The Court: All right. If we will, just so the record is clear, we will mark that as 5–A. Five does not go back. Did you understand, Mr. Grimes? Did you hear what I said?

[Green]: They are substituting the—

The Court: I'm not substituting because I want the record to be thoroughly preserved. This will be 5–A, and 5, the redaction that I did cutting, it will not go back but it will remain as 5. The one 5–A will go back.

The trial court then admitted the redacted booking photo as State's Exhibit 5–A over Green's objection.

Thereafter, Green called Dr. Jennifer Beaudry, an assistant professor of psychology at the University of South Carolina Beaufort, to testify regarding eyewitness identification procedures and "people's perceptions of those procedures." The trial court qualified her as an expert in "human memory and eyewitness identification" without objection. Dr. Beaudry first testified regarding common misconceptions about human memory, including that memory works "like a video camera," and that a person is more likely to recall the details of a traumatic event. Dr. Beaudry testified factors that can affect a person's ability to encode information, include: the presence of a weapon, whether the perpetrator is wearing a disguise, and whether the perpetrator and witness are of the same race. She further stated that lighting, exposure time, and stress also affect a person's ability to recall information. Specifically, Dr. Beaudry explained stress and "weapon focus" reduce a witness's identification accuracy. She also stated "research shows that [people are] much better at identifying someone of [their] own race than identifying somebody of a different race" and that cross-racial identification increases the chances of a false identification.

Following Dr. Beaudry's testimony, Green submitted proposed jury instructions regarding identification.[2] "Request to Charge Number One" advised the jury to consider the extent to which the perpetrator's features were visible, whether there were any distractions during the eyewitness's observation, whether the eyewitness experienced stress or fright at the time of the observation, and whether the witness's identification may have been impaired by personal motivations, biases, and prejudices. It instructed the jury to consider issues implicated by cross-racial identifications; specifically, that "[i]dentification by a person of a different race may be less reliable than identification by a person of the same race." This instruction also provided the jury with guidance concerning how to determine whether the identification was a product of the witness's own memory.

"Request to Charge Number 2" included instruction regarding the witness's opportunity to observe the subject of his testimony, whether the witness had something to gain by his testimony, motivation to lie, consistency of testimony, believability in light of the other evidence, and whether "there [was] anything about the way the witness testified that made the testimony more or less believable."

The trial court refused to issue Green's requested charges and stated it would charge the jury its "standard identification charge." It then gave the jury the following instruction regarding how to evaluate identifications made by witnesses:

---

2. The requested charges were based on cases from Utah and North Carolina. *See, e.g., State v. Long,* 721 P.2d 483, 492 (Utah 1986) (stating trial courts must give a "cautionary instruction" whenever eyewitness identification is a central issue in the case and that instruction is requested by the defense); *Kimiko Toma v. Utah Power & Light Co.,* 12 Utah 2d 278, 365 P.2d 788, 792 (1961), *overruled on other grounds by Williams v. Melby,* 699 P.2d 723, 729 (Utah 1985) (providing that "[juries] are not bound to believe all that any witness may have testified to nor are they bound to believe any witness. They may believe one witness as against many or many as against one."); *State v. Black,* 34 N.C.App. 606, 239 S.E.2d 276, 278 (1977) (reversing the trial court for failing to give a North Carolina standard charge that " 'the jury should be directed to scrutinize the evidence of a paid detective and make proper allowances for the bias likely to exist in one having such an interest in the outcome of the prosecution' " (quoting *State v. Boynton,* 155 N.C. 456, 71 S.E. 341, 344 (1911))).

An issue in this case is the identification of the defendant as the person who committed the crime charged. The State has the burden of proving identity beyond a reasonable doubt. You must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict the defendant.

Identification testimony is an expression of belief or impression by a witness. You must determine the accuracy of the identification of the defendant. You must consider the believability of each identification witness in the same way as any other witness.

You may consider whether the witness had an adequate opportunity to observe the offender at the time of the offense. This will be affected by things like how long or short a time was available, how far or close the witness was, the lighting conditions, and whether the witness had a chance to see or know the person in the past.

Once again, I instruct you, the burden of proof on the State extends to every element of the crime charged and this specifically includes the burden of proving beyond a reasonable doubt the identity of the defendant as the person who committed the crime.

If after examining the testimony you have a reasonable doubt as to the accuracy of the identification you must find the defendant not guilty.

Following the instructions, Green renewed his requests to charge, arguing the omission of his requested charges "deprived [him of] the right to a fair trial, the Sixth Amendment right to a jury trial by his peers." Green explained the proposed charges would assist the jury's evaluation of the identifications made in the case; specifically, relate to the jury its ability to consider whether the witness was distracted and experienced "weapon focus," whether the witnesses had the requisite ability to identify a member of a different race, and allowed the jury to consider the length of time between exposure and identification and the exposure of the witnesses to opinions of other people during the interval. The trial court declined to change its charge.

The jury convicted Green of armed robbery and possession of a weapon. Green had a prior conviction for armed robbery

and, before trial, the State had informed him he was facing a mandatory LWOP sentence pursuant to the recidivist statute, section 17–25–45 of the South Carolina Code (2014). Immediately before sentencing, Green argued a sentence of LWOP would violate the Eighth Amendment's ban on cruel and unusual punishment because he was a juvenile at the time of his prior conviction. He explained that although he was twenty years old at the time of sentencing, and nineteen years old at the time of the current offense, he was only seventeen years old when he committed the prior offense that served as the triggering offense under the recidivist statute. The trial court rejected Green's argument and sentenced him to LWOP for armed robbery.

Following his trial, Green filed a motion to vacate his sentence, reasserting that his sentence violated the Eighth Amendment's ban of cruel and unusual punishment because he was under the age of eighteen at the time of the triggering offense. The trial court denied Green's motion to vacate, finding that because Green was seventeen years old at the time of his prior conviction, he was not a "juvenile" under subsection 63–19–20(1) of the South Carolina Code (2010). *See id.* (defining juvenile as a "person less than seventeen years of age"). In addition, the trial court found Green was not a juvenile at the time of his second armed robbery conviction; therefore, it "ha[d] no other alternative but to sentence [him] to mandatory [LWOP] pursuant to [section] 17–25–45." This appeal followed.

## LAW/ANALYSIS

### I. Jury Charges

■ Green argues the trial court erred in refusing to give his proposed jury charges related to identification. According to Green, the trial court's "standard" identification charge "failed to ... inform the jury of how it should synthesize the additional facts and factors uncovered during cross-examination of the witnesses and through the testimony of [his] expert." We disagree.

■ "An appellate court will not reverse the trial [court]'s decision regarding a jury charge absent an abuse of discretion." *State v. Commander,* 396 S.C. 254, 270, 721 S.E.2d 413, 421–22 (2011) (internal quotation marks omitted). "To war-

rant reversal, a trial [court]'s refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant." *Id.* at 270, 721 S.E.2d at 422 (internal quotation marks omitted). "A jury charge which is substantially correct and covers the law does not require reversal." *State v. Brandt,* 393 S.C. 526, 549, 713 S.E.2d 591, 603 (2011). "[T]he trial court is required to charge only the current and correct law of South Carolina." *Id.* (alteration in original) (internal quotation marks omitted).

In *State v. Motes,* the defendant argued the trial court erred in refusing to give a *"Telfaire"* [3] instruction, which was designed to "focus the attention of the jury on the identification issue and minimize the risk of conviction through false or mistaken identification." 264 S.C. 317, 326, 215 S.E.2d 190, 194 (1975). Our supreme court found no prejudice in refusing the requested instruction because the trial court instructed the jury that it must find the testimony identified the defendant as the offender beyond a reasonable doubt. *Id.* The court also noted identification in the case presented no "peculiar problem" because two witnesses, one of whom was the defendant's wife and another who "had ample opportunity" to observe the defendant, both identified him as the perpetrator. *Id.* at 326–27, 215 S.E.2d at 194.

In the present case, the trial court did not err in refusing to issue Green's proposed charges. The trial court's "standard identification charge" was an accurate statement of the law in South Carolina. *See Brandt,* 393 S.C. at 549, 713 S.E.2d at 603 (explaining the "trial court is required to charge only the current and correct law of South Carolina"). Specifically, the trial court properly instructed the jury that it could "consider whether the witness had an adequate opportunity to observe the offender at the time of the offense," and that "[t]his will be affected by things like how long or short a time was available, how far or close the witness was, the lighting conditions, and whether the witness had a chance to see or know the person in the past." Although Green requested the trial court further instruct the jury in such matters as the extent to which the

---

**3.** *See United States v. Telfaire,* 469 F.2d 552, 558–59 (D.C.Cir.1972) (fashioning a model instruction trial courts should give when identification is a crucial issue).

perpetrator's features were visible, whether there were any distractions during the eyewitness's observation, whether the eyewitness experienced stress or fright at the time of the observation, and whether the witness's identification may have been impaired by personal motivations, Green has failed to show error from the absence of his requested charges because the substance of many of his requested charges were included in the trial court's "standard identification charge." Further, the trial court informed the jury that the State had the burden of proving beyond a reasonable doubt that Green committed the crime; therefore, the trial court's charge "adequately focused the attention of the jury on the necessity for a finding that the testimony identified defendant as the offender beyond a reasonable doubt." *Motes*, 264 S.C. at 326, 215 S.E.2d at 194.

In addition, we believe some of Green's requested charges would have been improper instructions into matters of fact or comments on the weight of the evidence. *See* S.C. Const. art. V, § 21 ("Judges shall not charge juries in respect to matters of fact, but shall declare the law."); *State v. Jackson*, 297 S.C. 523, 526, 377 S.E.2d 570, 572 (1989) (stating "a trial judge should refrain from all comment which tends to indicate to the jury his opinion on the credibility of the witnesses, the weight of the evidence, or the guilt of the accused"). Specifically, Green's request to charge the jury that "[i]dentification by a person of a different race may be less reliable than identification by a person of the same race" would have been improper because it would have asked the jury to place less weight on Victim's testimony because he was of a different race than Green.

Finally, we note that Green's reliance on two out-of-state cases—*Brodes v. State*, 279 Ga. 435, 614 S.E.2d 766 (2005) and *State v. Long*, 721 P.2d 483 (Utah 1986)—is misplaced.

In *Brodes v. State*, the trial court gave a "pattern jury instruction" on eyewitness identification that informed the jury "they may consider a witness's level of certainty in his or her identification in assessing the reliability of the identification." 614 S.E.2d at 767. The Supreme Court of Georgia noted that although Georgia has decided a jury instruction on eyewitness identification should be given when warranted by

the evidence, "other states see such a charge as superfluous when general instructions on witness credibility and burden of proof are given, or reject such an instruction as an impermissible judicial comment on the evidence." *Id.* at 771 n. 6. The court concluded, "When identification is an essential issue at trial, appropriate guidelines focusing the jury's attention on how to analyze and consider the factual issues with regard to the reliability of a witness's identification of a defendant as the perpetrator are critical." *Id.* at 771.

In *State v. Long,* the Supreme Court of Utah held that "cautionary instructions" based on those suggested in *United States v. Telfaire,* should be given when eyewitness identification is a central issue in the case and the defendant requests the instruction. 721 P.2d at 492. The court, however, declined to adopt one specific instruction and decided to grant the trial court discretion in crafting the instructions. *Id.*

Our review of *Brodes* and *Long* does not convince us that the trial court's failure to give Green's requested charges was reversible error. As noted in *Brodes,* South Carolina appears to fall in the class of jurisdictions that view instructions regarding "a witness's level of certainty in his or her identification in assessing the reliability of the identification" as "superfluous when general instructions on witness credibility and burden of proof are given" or "an impermissible judicial comment on the evidence." 614 S.E.2d at 771 n. 6. Moreover, *Long's* approval of the *Telfaire* instruction is insignificant because our supreme court has declined to find error from the failure to give a *Telfaire* charge when, as here, the trial court properly instructed the jury concerning the credibility of witness testimony and the believability of a victim's identification. *See, e.g., State v. Jones,* 273 S.C. 723, 735, 259 S.E.2d 120, 126 (1979) (finding "no merit" to the appellant's argument that the trial court erred in not issuing a *Telfaire* charge when the trial court's instruction on the credibility of the witnesses' testimony sufficiently covered the believability of the victim's identification); *State v. Jones,* 344 S.C. 48, 60, 543 S.E.2d 541, 547 (2001) (holding a *Telfaire* charge was unnecessary when the case did not involve a single witness identification). Therefore, the trial court did not err in refusing to give Green's requested identification charges.

## II. Mug Shot

Green argues the trial court erred in allowing the State to introduce his "mug shot" because it was unnecessary, cumulative to the State's case, and prejudicial because it suggested he had a prior criminal record. We disagree.

"Evidence which is not relevant is not admissible." Rule 402, SCRE. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, SCRE.

"A trial [court]'s decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in 'exceptional circumstances.'" *State v. Lyles,* 379 S.C. 328, 338, 665 S.E.2d 201, 207 (Ct.App.2008). "A trial [court]'s balancing decision under Rule 403 should not be reversed simply because an appellate court believes it would have decided the matter otherwise because of a differing view of the highly subjective factors of the probative value or the prejudice presented by the evidence." *Id.* at 339, 665 S.E.2d at 207. "If judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *Id.*

"The introduction of a 'mug-shot' of a defendant is reversible error unless: (1) the [S]tate has a demonstrable need to introduce the photograph, (2) the photograph shown to the jury does not suggest the defendant has a criminal record, and (3) the photograph is not introduced in such a way as to draw attention to its origin or implication." *State v. Traylor,* 360 S.C. 74, 84, 600 S.E.2d 523, 528 (2004) (citing *State v. Denson,* 269 S.C. 407, 412, 237 S.E.2d 761, 763–64 (1977)).

In *State v. Traylor,* the defendant argued the trial court committed reversible error in admitting "mug shots" of him into evidence. 360 S.C. at 83, 600 S.E.2d at 528. In the

photos, the defendant was not shown holding a "placard" with an arrest date and there was no indication of a law enforcement agency; however, the photos "had numerical markings on the side, indicating a height in inches." *Id.* at 77–78, 600 S.E.2d at 524–25. According to the opinion, however, "the photo of [the defendant] was clearly a mug shot, revealed by the front and side poses, and the height indicators." *Id.* at 80, 600 S.E.2d at 526. Our supreme court found the trial court erred in admitting the "mug shots" because the State did not have a demonstrable need to introduce them. *Id.* at 84, 600 S.E.2d at 528. The court rejected the State's argument that it could not prove the defendant was in the victim's home without the mug shots because the defendant's accomplice testified the defendant was at the scene of the crime, and the victims testified at trial, describing the attack and the identity of the assailants. *Id.* Our supreme court noted the State could "very easily have questioned the victims as to their observations of the white male assailant at the time of the crime, his tall thin frame and thin face, in order to support their in-court identifications without resort to the photo line-up." *Id.* Nevertheless, the court found the defendant suffered no prejudice by the admission of the mug shots because during cross-examination, a police officer testified the defendant's photo was taken after his arrest for his current charges. *Id.* at 84–85, 600 S.E.2d at 528.

In *State v. Denson,* the defendant challenged the trial court's admission of three photographs of him, arguing the photos suggested to the jury that he had a prior criminal record. 269 S.C. at 410, 237 S.E.2d at 763. Our supreme court found the State had a demonstrable need to introduce the photos because the defendant's absence from trial made an in-court identification impossible. *Id.* at 412, 237 S.E.2d at 764. Additionally, the court found the photos did not imply that the defendant had a prior criminal record because they "were not the juxtaposed full face and profile photographic display normally associated with 'mug shots,'" and although one of the photos included the words "Richland County," the jury likely assumed the picture was taken when the defendant was arrested for his current charge. *Id.* at 412–13, 237 S.E.2d at 764. The court further noted the record did not show "the admission of the photographs in any way focused the jury's

attention on the source of the pictures." *Id.* at 413, 237 S.E.2d at 764. Although the jury was informed that the photos came from police files, the supreme court found this testimony "only explained the source of the photographs, it did not draw particular attention to the source or implications of the photographs." *Id.* (internal quotation marks omitted).

In *State v. Robinson,* the defendant argued the trial court erred in admitting a photo of him, "consist[ing] of three different poses: (1) a full frontal pose, (2) a profile, and (3) a frontal view of the head and shoulders" with all written material on the photograph "blackened out." 274 S.C. 198, 200, 262 S.E.2d 729, 730 (1980). There, the victim was the sole eyewitness to a murder, and after the shooting, she identified the defendant's photo as that of the assailant; however, at a subsequent police line-up, she identified another individual as the assailant. *Id.* at 199, 262 S.E.2d at 730. After the defense cross-examined the victim about her failure to identify the defendant at the police line-up, the State introduced the photo of the defendant. *Id.* at 199–200, 262 S.E.2d at 730. On appeal, our supreme court found the State had a demonstrable need to introduce the photo because the defendant emphasized the victim's failure to identify the defendant at the police line-up and her description of the assailant after the shooting; therefore, the photo was needed to show the jury that the photographic identification was valid and reliable. *Id.* at 200–01, 262 S.E.2d at 730. Additionally, the court found nothing on the face of the photo indicated that the defendant had a prior criminal record, and the jury could have easily inferred that the photo was taken when the defendant was arrested for the current charge. *Id.* at 201, 262 S.E.2d at 730.

 Here, the trial court did not err in admitting the booking photo because the probative value of the booking photo was not substantially outweighed by the danger of unfair prejudice, and the State satisfied the three-factor test for the admissibility of a mug shot under *State v. Denson.* *See* Rule 403; *Traylor,* 360 S.C. at 84, 600 S.E.2d at 528 (stating "[t]he introduction of a 'mug-shot' of a defendant is reversible error unless: (1) the [S]tate has a demonstrable need to introduce the photograph, (2) the photograph shown to the jury does not suggest the defendant has a criminal record,

and (3) the photograph is not introduced in such a way as to draw attention to its origin or implication." (citing *Denson,* 269 S.C. 407, 237 S.E.2d 761)).

First, the State had a demonstrable need to introduce the booking photo. The photo included a side-view of Green's face, which the State needed to show the jury because it allowed the jury to compare the photo to the still photos from the surveillance video of the robbery, which also showed the side of the assailant's face. Although Green appeared at trial and the jury presumably could see his face, admitting the booking photo into evidence allowed the jury to compare the booking photo to the photos of the robbery during its deliberations. In addition, the side-view photo of Green's face was highly probative because it depicted a clear shot of Green's nose, which Detective Lawrence described as very distinctive and one of the reasons he was able to identify Green as the assailant from the surveillance video. Thus, the booking photo was also important for witness credibility because it allowed the jury to assess Detective Lawrence's identification of Green as the man in the surveillance video. The probative value of the booking photo was further enhanced because Green challenged the reliability of Victim's identification; therefore, it became crucial for the jury to assess Victim's and Detective Lawrence's identification of Green. *See State v. Stephens,* 398 S.C. 314, 321, 728 S.E.2d 68, 72 (Ct.App.2012) (finding the probative value of a mug shot of the defendant increased when the defendant challenged the reliability of the victim's identification). Accordingly, the State had a demonstrable need to introduce the booking photo.

Next, the booking photo did not "suggest [Green] has a criminal record." *Traylor,* 360 S.C. at 84, 600 S.E.2d at 528. The trial court redacted the booking photo, removing any identifying marks that indicated the photo was taken as a result of an arrest. Green is wearing street clothes and is not holding a placard or other information indicating an arrest. *See State v. Ford,* 334 S.C. 444, 450 n. 3, 513 S.E.2d 385, 388 n. 3 (Ct.App.1999) (finding "mug shots" that depicted "[o]nly the heads and necks of the individuals in the lineup" with "no identifying clothing or placards" did not suggest the defendant had a prior criminal record). Although the booking photo includes the side-view profile picture of Green, which is a

feature commonly associated with police mug shots, this factor alone is insufficient to suggest he had a prior criminal record because the jury knew Green was arrested for the current armed robbery and likely assumed the picture was taken following his arrest. *See Robinson,* 274 S.C. at 200–01, 262 S.E.2d at 730 (finding a photo of the defendant did not suggest he had a criminal record when there was nothing on the face of the photo that would indicate that the defendant had a prior criminal record, and the jury could have inferred that the photograph was the result of the current investigation). Therefore, the booking photo did not suggest Green had a criminal record.

Further, the booking photo was not "introduced in such a way as to draw attention to its origin or implication." *Traylor,* 360 S.C. at 84, 600 S.E.2d at 528. The trial court enlarged the photo so that it was "in conformity with all the other paper page sizes" admitted into evidence, and it also cut the "top and bottom off" of the photo to remove any reference to the law enforcement agency. Importantly, the court admitted the photo during Detective Lawrence's testimony that the booking photo was a fair and accurate description of Green when he was arrested for the current armed robbery; therefore, the manner the photo was introduced implied that the booking photo was taken following Green's current arrest. Thus, this factor weighs in favor of the admissibility of the booking photo.

Finally, we note that Green suffered little prejudice, if any, from the admission of the booking photo because it did not suggest he had committed prior bad acts. *See Traylor,* 360 S.C. at 84 n. 12, 600 S.E.2d at 528 n. 12 (explaining the reason the admission of a mug shot is reversible error unless the State satisfies the *Denson* test is that "such photos are prejudicial because they imply a defendant's prior bad acts"). As previously stated, there was nothing on the face of the booking photo or the manner in which it was introduced that suggested Green had a prior criminal record. In addition, the booking photo was cumulative to other evidence admitted at trial because the trial court admitted the line-up photo of Green that was shown to Victim, and Green has not challenged that ruling on appeal. Accordingly, the trial court did not err in admitting the booking photo because the probative value of

the booking photo was not substantially outweighed by the danger of unfair prejudice, and the State satisfied the *Denson* test.

## III. LWOP SENTENCE

Green argues his "sentence of LWOP, which was mandatory pursuant to the recidivist statute, violates the Eighth Amendment's ban on cruel and unusual punishment because [he] was under the age of eighteen at the time of the triggering offense." We disagree.

### A. Propriety of Sentencing Enhancement

Subsection 17–25–45(A)(1)(a) of the South Carolina Code (2014) provides that, "[E]xcept in cases in which the death penalty is imposed, upon a conviction for a most serious offense[,] . . . a person must be sentenced to a term of imprisonment for [LWOP] if that person has . . . one or more prior convictions for . . . a most serious offense." Armed robbery is defined as a "most serious offense." S.C.Code Ann. § 17–25–45(C)(1) (2014).

Under the recidivist statute, a conviction "means any conviction, guilty plea, or plea of nolo contendere." S.C.Code Ann. § 17–25–45(C)(3) (2014). In *State v. Ellis*, our supreme court held a juvenile adjudication is not a conviction under the mandatory LWOP provisions of the recidivist statute. 345 S.C. 175, 179, 547 S.E.2d 490, 492 (2001). In *State v. Standard*, the supreme court distinguished *Ellis* and held that when a juvenile is tried and adjudicated as an adult, such that his guilty plea to armed robbery is in general sessions court, the guilty plea is a conviction for purposes of the recidivist statute. 351 S.C. 199, 203, 569 S.E.2d 325, 328 (2002).

 The trial court did not err in sentencing Green to LWOP for armed robbery under the recidivist statute. At the time of sentencing for his current armed robbery conviction, Green had a prior conviction for armed robbery. Although Green was seventeen years old when he committed the prior armed robbery, he was tried and convicted of that offense as an adult in general sessions court. Based on *Standard*, because Green was tried and adjudicated as an adult, his prior armed robbery conviction is a "conviction" for purposes of

section 17–25–45. Moreover, armed robbery is a "most serious offense" under subsection 17–25–45(C)(1). Because Green had a prior conviction for a "most serious offense," the trial court was required to sentence him to LWOP once Green was convicted of the current armed robbery. *See* § 17–25–45(C)(1) (stating a person convicted of a "most serious offense" "*must* be sentenced to [LWOP] if that person has ... one or more prior convictions for ... a most serious offense" (emphasis added)). Thus, the trial court did not err in sentencing Green to LWOP for armed robbery under section 17–25–45.

## B. Sentence Enhancement as Cruel and Unusual Punishment

█ We next address whether Green's sentence, though proper under the recidivist statute, nevertheless violated the Eighth Amendment's ban on cruel and unusual punishment.

█ "The Eighth Amendment only prohibits sentences which are grossly out of proportion to the severity of the crime." *Curtis v. State*, 345 S.C. 557, 575, 549 S.E.2d 591, 600 (2001).

In *Standard,* our supreme court held it is not cruel and unusual punishment to sentence a defendant to LWOP utilizing enhanced penalties for a burglary committed when the defendant was a juvenile so long as the defendant was tried and sentenced as an adult for the triggering offense. 351 S.C. at 204, 569 S.E.2d at 328. The court stated that "an enhanced sentence based upon a prior most serious conviction for a crime which was committed as a juvenile does not offend evolving standards of decency so as to constitute cruel and unusual punishment." *Id.* at 206, 569 S.E.2d at 329 (emphasis omitted). Likewise, in *State v. Williams,* this court held that a LWOP sentence under the recidivist statute for distribution of cocaine was not cruel and unusual punishment, although the defendant's prior conviction was for an offense committed when he was a juvenile because the sentence was not inconsistent with evolving standards of contemporary values, and was not grossly disproportionate to the committed offense. 380 S.C. 336, 345–46, 669 S.E.2d 640, 645 (Ct.App.2008).

We find Green's sentence of LWOP for armed robbery does not constitute cruel and unusual punishment. Initially, we note that although Green was seventeen years old when he committed the offense that led to his prior conviction, he is considered a "juvenile" at the time of the prior offense for purposes of our analysis. *See Aiken v. Byars,* 410 S.C. 534, 537 n. 1, 765 S.E.2d 572, 573 n. 1 (2014) (recognizing *"Miller* [4] extends to defendants under eighteen years of age and therefore for the purposes of this opinion we consider juveniles to be individuals under eighteen"). Thus, the trial court erred in finding Green was not a juvenile at the time of his prior conviction. Nevertheless, the trial court did not err in finding Green's sentence did not constitute cruel and unusual punishment because our appellate courts have rejected the argument that it is cruel and unusual punishment to use prior convictions for offenses committed as juveniles for sentencing enhancement under section 17–25–45. *See Standard,* 351 S.C. at 204, 569 S.E.2d at 328; *Williams,* 380 S.C. at 345–46, 669 S.E.2d at 645. We note that this case is somewhat different from *Standard* because there the defendant had finished serving the sentence for his first offense prior to committing the second offense that led to his LWOP sentence. 351 S.C. at 201, 569 S.E.2d at 326–27. Here, however, Green had not yet served his first sentence for armed robbery prior to committing the second armed robbery that led to his LWOP sentence. This is an important consideration because one theory of the recidivist statute is to punish "persons who continue to commit criminal, antisocial behavior *after incarceration* for an earlier offense." *State v. Benjamin,* 353 S.C. 441, 446, 579 S.E.2d 289, 291 (2003) (Waller, J., dissenting) (emphasis added). Nevertheless, our supreme court has never held that a defendant must finish serving his first sentence before he may be sentenced to LWOP under the recidivist statute based on a subsequent conviction for a most serious offense.

We also find Green's reliance on *Miller* is misplaced. Although *Miller* held that mandatory LWOP sentences for juveniles violate the Eighth Amendment, Green was twenty

---

4. *Miller v. Alabama,* —— U.S. ——, 132 S.Ct. 2455, 2464, 183 L.Ed.2d 407 (2012) (holding "mandatory [LWOP] sentences for juveniles violate the Eighth Amendment").

years old at the time of sentencing; therefore, he was not a juvenile when he was sentenced to LWOP. *Miller's* holding was based, in part, on the "recklessness, impulsivity, and heedless risk-taking" of children; however, because Green was not a juvenile at the time he committed the current armed robbery, the policy considerations from *Miller* are inapplicable. 132 S.Ct. at 2458; *see also Aiken*, 410 S.C. at 541–42, 765 S.E.2d at 576 ("[T]he Court in *Miller* noted that ... children were constitutionally different from adults for sentencing purposes, a conclusion that was based on common sense as well as science and social science."). Therefore, Green's LWOP sentence did not violate the Eighth Amendment.

## C. Discretion

Green next argues that even if the Eighth Amendment's ban on cruel and unusual punishment does not forbid sentencing defendants to mandatory LWOP when the triggering offense occurred when the defendant was under eighteen years old, the Eighth Amendment requires trial courts to make individualized sentencing decisions. We disagree. Green's sentence was within the limits provided for by statute and the record does not reveal his sentence was the result of prejudice, oppression, or corrupt motive by the trial court. Therefore, we have no authority to review Green's sentence. *See State v. Franklin*, 267 S.C. 240, 246, 226 S.E.2d 896, 898 (1976) (stating "[an appellate court] has no jurisdiction to review a sentence, provided it is within the limits provided by statute for the discretion of the trial court, and is not the result of prejudice, oppression or corrupt motive").

## CONCLUSION

Based on the foregoing, the trial court is

**AFFIRMED.**

FEW, C.J., and THOMAS, J., concur.